STATE of Tennessee

v.

James P. STOUT.

Supreme Court of Tennessee,
at Jackson.

May 24, 2001.

Robert C. Brooks and William D. Massey, Memphis, TN, for the appellant, James P. Stout.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Joseph F. Whalen, Assistant Attorney General; John W. Pierotti, District Attorney General; and Jerry Harris and Lee Coffee, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

E. RILEY ANDERSON, C.J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, filed a concurring and dissenting opinion.

The defendant, James P. Stout, was convicted of felony murder, especially aggravated kidnapping, and especially aggravated robbery. Following the sentencing phase of the trial for felony murder, the jury found that the evidence supported three aggravating circumstances: (1) that the defendant was previously convicted of a felony whose statutory elements involved the use of violence to the person; (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery or kidnapping. See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7) (Supp.1995). Upon finding that the evidence of these three aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death.

The Court of Criminal Appeals affirmed the convictions and sentences, and the case was docketed in this Court.[1] After reviewing the decision of the Court of Criminal Appeals, the record, and the applicable authority, we designated seven issues for oral argument [2] and conclude as follows: (1) the evidence was sufficient to support the jury's verdict; (2) the trial court did not commit reversible error in allowing Tonya Woodall to testify as to statements made by Quentin Jordan; (3) the admission of facts underlying the defendant's prior conviction for a violent felony during sentencing did not affect the jury's determination to the prejudice of the defendant; (4) the prosecutor's use of the defendant's prior convictions to crossexamine a defense witness during sentencing did not affect the jury's determination to the prejudice of the defendant; (5) the exclusion of mitigating evidence offered by the defendant during sentencing did not affect the jury's

---

1. _See_ Tenn. Code Ann. § 39-13-206(a) (1997) (Upon the Court of Criminal Appeals' affirmance of a death sentence, the appeal shall automatically be docketed in the Supreme Court).

2. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider _all_ errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

determination to the prejudice of the defendant; (6) the felony murder aggravating circumstance was properly applied; and (7) the sentence of death was not arbitrary or disproportionate. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

### Guilt Phase

The defendant, James P. Stout, was convicted of the felony murder, especially aggravated kidnapping, and especially aggravated robbery of the victim, Amber Hunter, age 26. The evidence is summarized as follows.

On November 8, 1995, the defendant and three co-defendants, Derrick Carmichael, Robert Terrell, and Quentin Jordan, were at the apartment of Tonya Woodall in Memphis, Tennessee. Jordan testified that the four men left Woodall's apartment in a blue Corsica driven by Terrell. The defendant, who was in the front passenger seat, saw the victim driving her car and said that he "was going to get this whore." The four men followed the victim for five or ten minutes and then pulled behind her car as she parked in front of her house.

According to Jordan, the defendant got out of the car, grabbed the victim by her hair, put a gun to her stomach, and forced her into the backseat of her car. The defendant got in the driver's seat of the victim's car while Jordan got in the backseat with the victim. The defendant handed the gun to Jordan. Jordan testified that the defendant asked the victim if she believed in God. When the victim said that she did, the defendant said, "Well, you're with the devil now." When Jordan addressed the defendant by name at one point, the defendant replied that the victim would have to be killed because she knew his name and had seen his face. The defendant stopped the victim's car near some railroad tracks, took the gun back from Jordan, got out of the car, and pulled the victim from the rear seat. According to Jordan, the defendant asked the victim if she "wanted to hug a real man before she died." The defendant embraced the victim; then he stepped back and shot her once in the head. After taking a suitcase from the victim's car and trying to wipe off any fingerprints, the defendant and Jordan left the scene with Terrell and Carmichael.

Like Jordan, Derrick Carmichael testified that he, the defendant, Jordan, and Terrell left Tonya Woodall's apartment in a blue Corsica. The defendant spotted the victim driving her car, instructed Terrell to follow the car, and said he was going to "rob" the victim. When the victim parked in front of her house, the defendant and Jordan got out of the car and approached her. The defendant, who was armed with a gun, grabbed the victim before she made it to her house. The defendant gave the gun to Jordan, who got in the backseat of the victim's car with the victim. The defendant drove the victim's car and Terrell and Carmichael followed them. According to Carmichael, the defendant parked near some railroad tracks and got out of the car with the victim and Jordan. The defendant hugged the victim and then shot her. The defendant and Jordan got back in the Corsica and the four men left the scene.

Robert Terrell's testimony was similar to that of Jordan and Carmichael. He testified that as they left Tonya Woodall's apartment, the defendant was checking a small pistol for bullets and said they "were going to make a sting." The defendant tried to get Terrell to follow several cars, but Terrell refused. Terrell testified that the defendant told him to park the car while he went to his aunt's house; when

Terrell stopped the car, the defendant and Jordan got out. Terrell testified that he then saw the defendant and Jordan driving toward him in a red car, and he followed. When the defendant stopped the car, Terrell saw Jordan and the victim get out of the backseat. Terrell testified that the defendant hugged the victim and then shot her once in the head. The defendant and Jordan returned to the car Terrell was driving with some of the victim's property. Terrell drove the defendant and Jordan back to Woodall's apartment and also saw them at the apartment the next night. According to Terrell, Jordan was upset, crying, and cursing the defendant. The defendant said, "Well, she heard my name, so I had to kill her."

Tonya Woodall testified that the defendant, Jordan, Carmichael, and Terrell were together at her apartment on November 8, 1995. On the following day, she saw Jordan, who looked "depressed" and "upset." Jordan initially would not tell Woodall what was wrong, but finally told her that the defendant had killed a woman. Woodall later heard Jordan confronting the defendant, but she did not hear the defendant make a response. Woodall testified that the police threatened to charge her as an accessory to the offense unless she made a statement. She also testified that the defendant had threatened her and her family if she testified.

The defendant gave a statement to police that varied markedly from the above testimony of Jordan, Carmichael, and Terrell. The defendant said that he, Jordan, and two others--Vassy Gandy and Rico Bowers--were at Tonya Woodall's apartment on the night in question.[3] When they left, they rode around in a white Mustang with Gandy driving and the defendant in the backseat. Bowers, who was armed with a pistol, told Gandy to follow the victim's car. When the victim's car stopped, Bowers got out and grabbed the victim by her hair and forced her into the backseat of her car with Jordan. According to the defendant's statement, Bowers drove the victim's car to some railroad tracks and got out of the car with Jordan and the victim. Bowers hugged the victim, backed away about five feet, and fired one shot. Bowers and Jordan searched the victim's car and wiped it down. According to the defendant's statement, the four men returned to Woodall's apartment where Jordan and Bowers "bragged" about what had happened. The defendant denied knowing that a robbery, car jacking or killing was going to occur.[4]

The victim, Amber Hunter, a total stranger to the defendant, was 26 years old at the time she was killed. She was a college graduate and was employed at a bank. She was returning home from a church service on the night she was killed. The victim sustained a gunshot wound to her head and remained unconscious until her death two days later on November 10, 1995.

After hearing the evidence and deliberating, the jury found the defendant guilty of felony murder for the killing of the victim in the perpetration of a robbery, especially aggravated kidnapping, and es-

---

3. Woodall testified that Gandy and Bowers had not been at her apartment on the day of the offense. Likewise, Jordan and Terrell testified that they did not see Gandy or Bowers on the night of the offense. Carmichael, on the other hand, testified that he saw both Gandy and Bowers at Woodall's apartment on the night of the offense.

4. In his statement, the defendant said that he, Jordan, Bowers and Gandy were members of a gang called the "gangster disciples." During the trial, however, the defendant attempted to show through cross-examination that the others falsely accused him of the crime because he was a former member of the gang.

pecially aggravated robbery. The trial then moved into the sentencing phase for the offense of felony murder.

### Sentencing Phase

In seeking the death penalty for the defendant's conviction for felony murder, the prosecution introduced evidence that the defendant was convicted of especially aggravated robbery in January of 1997. The victim of that offense, Walter Bush, testified during the sentencing phase that he was car-jacked and shot in the head by the defendant on November 11, 1995. Bush testified that the defendant had first asked if he knew the defendant or would recognize him and that when Bush said no, the defendant told him to walk away. When Bush had walked three or four feet, the defendant shot him. Bush admitted that two other men had been with the defendant and that two of the men had guns. Bush nonetheless testified that the defendant was the person who shot him.

The defendant presented several witnesses in mitigation. The defendant's mother, Annette Bailey, testified that she was an exotic dancer and prostitute at the time she became pregnant with the defendant and that she used cocaine during the pregnancy. When the defendant was three weeks old, Bailey gave him to her mother, Francis Beasley, who later obtained custody. Bailey testified that she rarely saw the defendant and felt that his problems were her fault. She said that the defendant's father knew about the trial, but would not appear on behalf of the defendant.

Francis Beasley testified that she had six children, including the defendant's mother, and that she raised the defendant as "one of her own." All of her children, except the defendant's mother, helped to raise the defendant and engaged in family activities. Beasley took the defendant to church every Sunday, and the defendant continued to be an active member of the church up until the time of his arrest. The defendant had treated her with love and respect and had been very close to Beasley's husband before his death in 1991. Beasley testified that when the defendant was 16 or 17, he was "devastated" when his mother told him she wished he had never been born. Beasley asked the jury to spare the defendant's life.

Sheronda Bond testified that she was the defendant's fiancée and that she and the defendant had a child together. Their child, as well as the defendant's older child through another relationship, visited the defendant in prison. According to Bond, the defendant shows love and concern for the children. She asked the jury to spare the defendant's life.

Other family members testified on the defendant's behalf. Thomas Stout, the defendant's grand-uncle, testified that he was the Pastor in the church attended by the defendant. He visited the defendant in prison, where they discussed scripture and read the Bible. Teresa Stout, the defendant's aunt, testified that she had been close to the defendant his entire life and that the defendant was "devastated" when his grandfather passed away in 1991. She asked the jury to spare the defendant's life.

Randall Stout, the defendant's uncle, testified that he went to church with the defendant and taught him how to play musical instruments with the church choir. He testified that the defendant was not a "villain" and had been a nice child. He testified that the defendant had continued his involvement in the church and was a "changed person." On cross-examination, Stout acknowledged that the defendant was involved with a gang called the "gangster disciples." Stout was also aware of the defendant's prior convictions for aggravated burglary, theft, reckless endangerment,

and the especially aggravated robbery of Walter Bush. Stout nonetheless said that the charges against the defendant had been "trumped up."

Makimba Fowler testified that he was in jail with the defendant in June of 1993. Both men were members of a gang called the gangster disciples, which had a large number of members in the jail. Fowler testified that the defendant was expelled from the gang when he was beaten by other gang members and stabbed with an ink pen. Donald Justus, a prison jailor, testified that he saw the defendant in June of 1993 with a "bruised eye and stuff." Justus testified that prisoners who were not gang members were often in danger from gang members.

The jury determined that three aggravating circumstances had been proven beyond a reasonable doubt: (1) the defendant was previously convicted of a felony whose statutory elements involve the use of violence to the person; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (3) the murder was knowingly committed, solicited, directed, or aided by the defendant while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery or kidnapping. See Tenn. Code Ann. § 39-13-204(i)(2), (6), & (7) (Supp.1995). The jury found that the evidence of these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt and, therefore, imposed a death sentence. See id. § 39-13-206 (1991 & Supp.1995). In a separate sentencing proceeding, the trial court imposed two forty-year sentences for the offenses of especially aggravated robbery and especially aggravated kidnapping, to be served consecutively to one another and consecutively to the death sentence.

### Sufficiency of the Evidence

The defendant argues that there was no evidence to corroborate the testimony of the accomplices to the offense and that, therefore, the evidence was insufficient to support his convictions. The State maintains that the evidence was legally sufficient to support the convictions in this case and to corroborate the testimony of the three accomplices.

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation omitted); *State v. Keough*, 18 S.W.3d 175, 180-81 (Tenn.2000). We are required to afford the prosecution the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Keough*, 18 S.W.3d at 181 (citation omitted). Questions regarding the credibility of the witnesses, the weight to be given the evidence, and any factual issues raised by the evidence are resolved by the trier of fact. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997).

In Tennessee, a conviction may not be based solely upon the uncorroborated testimony of an accomplice. *See State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 214 Tenn. 171, 379 S.W.2d 34, 43 (1964). We have described the nature of this requirement as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the

defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*State v. Bigbee,* 885 S.W.2d at 803 (quoting *State v. Gaylor,* 862 S.W.2d 546, 552 (Tenn.Crim.App.1992)). Whether sufficient corroboration exists is a determination for the jury. *See State v. Bigbee,* 885 S.W.2d at 803.

■ In our view, there was sufficient evidence to sustain the jury's verdicts that the defendant committed the offenses of felony murder, especially aggravated kidnapping, and especially aggravated robbery, and there was sufficient evidence to corroborate the testimony of the accomplices to these crimes. As the Court of Criminal Appeals noted, the defendant initially denied knowledge of the offenses when questioned by police, but then later admitted that he was at the scene. Moreover, the defendant admitted that he knew one of the participants was armed and intended to steal a car. Finally, Tonya Woodall testified that the defendant threatened her and her family if Woodall testified against him. When viewed under the standards discussed above, we conclude that there was sufficient evidence to corroborate the testimony of the accomplices and to support the jury's verdicts.

### Admissibility of Hearsay Statements

The defendant asserts that the trial court erred by allowing Tonya Woodall to testify that Quentin Jordan told her that the defendant had killed the victim and other details about the offenses because the statements were inadmissible hearsay. The State maintains that the Court of Criminal Appeals properly determined that Jordan's statements were admissible as a prior identification and as an excited utterance. *See* Tenn. R. Evid. 803(1.1), 803(2).[5]

■ A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A hearsay statement is not admissible unless it is shown to be admissible via an exception contained in the rules of evidence or otherwise by law. *See* Tenn. R. Evid. 802. The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court. *See State v. Stinnett,* 958 S.W.2d 329, 331 (Tenn.1997). We will not reverse the ruling of the trial court absent a showing that this discretion has been abused. *See id.*

### Prior Identification

■ The defendant argues that the trial court erred in allowing Woodall to testify as to Jordan's statement as a prior identification pursuant to Tenn. R. Evid. 803(1.1). The State maintains that the trial court did not abuse its discretion in admitting the testimony.

The hearsay rule does not exclude a "statement of identification of a person

5. The State does not contest the Court of Criminal Appeals' ruling that the statements were not admissible as the statements of a co-

conspirator or as statements against Jordan's penal interest. *See* Tenn. R. Evid. 803(1.2)(E), 804(b)(3).

made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." Tenn. R. Evid. 803(1.1). Thus, a party seeking to admit evidence under this exception must establish four elements: (1) that the declarant made an identification of a person; (2) that the identification was made after perceiving the person; (3) that the declarant testified at the hearing or trial in which the prior identification was introduced; and (4) that the declarant was subject to cross-examination about the statement. *See* Neil P. Cohen et al., *Tennessee Law of Evidence*, § 803(1.1).2, at 507-08 (3d ed. 1995).

The prior identification exception is most often used in a criminal case where the victim or witness has identified the defendant from a sketch, lineup, or photographic display and then later testifies at a hearing or trial regarding the earlier identification. The fact that the prior identification was made is admissible under Rule 803(1.1) as substantive evidence regardless of whether the witness has identified the defendant in court. *See id.* § 803(1.1).1, at 507. As this treatise explains:

> *The trustworthiness of such hearsay declarations is established by the opportunity to cross-examine the declarant, who by definition must testify at trial.* The evidence may also be more accurate than in-court testimony because the earlier identification was made while the appearance of the person identified was fresher in the declarant's memory and the in-court identification may be more suggestive than the out-of-court.

*Id.* § 803(1.1).1, at 506 (emphasis added).

In this case, the defendant contends that Jordan's statement to Woodall was not a prior identification for purposes of Rule 803(1.1), but rather was a mere allegation that the defendant had committed the offense. The defendant correctly observes

that the vast majority of cases apply this hearsay exception where an identification has been made from a photograph display, lineup, or similar procedure. *See* 30B Michael H. Graham, *Federal Practice and Procedure*, § 7014 (Interim ed. 2000); *see also Tennessee Law of Evidence*, § 803(1.1).1, at 506. As one court has stated, for example, the history of the federal version of the prior identification rule reveals that Congress envisioned "lineups, show-ups, photo arrays, chance encounters, or other circumstances under which a positive identification may become uncertain by the time of trial." *State v. Lopez*, 123 N.M. 599, 943 P.2d 1052, 1055 (Ct.App. 1997) (citations omitted).

Case law and custom notwithstanding, the rule itself does not expressly limit its application to prior identifications from photographs, lineups, or other similar procedures. It simply states that there must be an identification of a person "made after perceiving the person." *See Tennessee Law of Evidence*, § 803(1.1).2, at 507-08. We interpret this language to mean what it says: that the person who made the identification must have personally perceived the person identified. *See e.g., id.* § 803(1.1).2, at 507 ("The declarant 'perceives' by the use of the five senses."). Although this may, in a majority of cases, involve an identification by viewing a defendant in a photograph, lineup, or like procedure, we do not believe it must be limited to such cases in the absence of express limiting language in the rule. As discussed above, the rule safeguards the trustworthiness of an identification by requiring that the declarant testify at trial and be subject to cross-examination regarding the statement of identification. These safeguards in the rule are in place regardless of whether the identification is based on a photo display, lineup, or simply

a statement made to another person, as in this case.

Accordingly, in applying Rule 803(1.1), it is apparent that Jordan testified he was at the scene and personally perceived the defendant shoot the victim. Moreover, Jordan testified at the trial and was subject to cross-examination regarding his statement to Woodall. Although we recognize that Jordan's participation in the crimes gave rise to the possibility that his identification of the defendant was a self-serving effort to point the finger of blame at someone other than himself, such circumstances were open to cross-examination of Jordan by the defendant. Accordingly, given that the safeguards and remaining elements of Rule 803(1.1) were satisfied, we agree with the Court of Criminal Appeals that the trial court did not abuse its discretion under the circumstances of this case.[6]

### Excited Utterance

The defendant also contends that the trial court erred in allowing Woodall to testify about Jordan's statements under the excited utterance exception in Tenn. R. Evid. 803(2). The defendant argues that Jordan's statements were made several hours after the offense and were not made while Jordan was stressed or excited. The State maintains that the trial court did not abuse its discretion in finding that the proper foundation was shown for admitting the statements pursuant to the excited utterance exception.

The hearsay rule does not exclude a statement "relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2).

The rationale for the admissibility of such a statement, known as an "excited utterance," is twofold:

> First, since this exception applies to statements where it is likely there was a lack of reflection--and potential fabrication--by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity.... Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

*Tennessee Law of Evidence*, § 803(2).1, at 532; *see State v. Gordon*, 952 S.W.2d 817, 819 (Tenn.1997).

The first requirement is that there be a startling event or condition. As noted in *Tennessee Law of Evidence*, the "possibilities are endless" because "[a]ny event deemed startling is sufficient." § 803(2).2, at 533. The "event must be sufficiently startling to suspend the normal, reflective thought processes of the declarant." *State v. Gordon*, 952 S.W.2d at 819 (quoting *McCormick on Evidence*, § 297, at 854 (3d ed. 1984)). The second requirement, that the statement "relate to" the startling event or condition, is likewise broad. As stated in *Tennessee Law of Evidence*, the statement "may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." § 803(2).2 at 534.

The third requirement, that the statement be made while the declarant is under the stress or excitement from the event or

---

**6.** We do stress, however, that no other details of an offense should be admitted under this exception to the hearsay rule inasmuch as the rule allows only the prior identification. *See State v. Lopez*, 943 P.2d at 1056. Thus, to the

extent that Jordan's statements to Woodall contained other details of the offenses, those statements were inadmissible unless, as here, another hearsay exception was established.

condition, relates most directly to the underlying rationale for the exception. In *State v. Smith,* 857 S.W.2d 1, 9 (Tenn. 1993), we said that "[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." The time interval between the startling event and the declarant's statement, however, is but one consideration in determining whether a statement was made under stress or excitement:

> Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress.

*State v. Gordon,* 952 S.W.2d at 820 (quoting *Tennessee Law of Evidence,* § 803(2).2, at 534).

When considering these factors in combination with the purpose of the rule, the admissibility of Jordan's statement to Woodall presents a very close question. On one hand, there is little doubt that the killing of the victim was a startling event of a serious nature and degree and that Jordan was a witness to the event. On the other hand, over twelve hours elapsed from the time of the event to the time of Jordan's statements. Moreover, the time interval is significant inasmuch as Jordan was a participant in the events and arguably had time to reflect and deliberate before making his statements to Woodall. Despite these factors, however, the trial court specifically found that Jordan was

under the "stress of the traumatic events of the night before" when the statements were made. Indeed, Woodall testified that Jordan was upset and depressed on the morning of November 9, 1995, and that Jordan was later crying and upset when he made the statements to her. Similarly, Jordan testified that he had tears in his eyes after the defendant shot the victim and that he was "depressed." Jordan testified that when he spoke to Woodall, he pictured "his life gone" and everyone "dead." Jordan said that he was still in shock, upset, crying, and depressed when he told Woodall about the offense.

■ As noted above, our role as a reviewing court is not to substitute our view of the admissibility of evidence for that of the trial court, but rather to determine whether the trial court's ruling constitutes an abuse of discretion. The record indicates that the trial court considered all of the relevant factors, including the passage of time, in making its ruling on what amounts to an extremely close issue. *See Gross v. Greer,* 773 F.2d 116 (7th Cir. 1985). Under these circumstances, we conclude that the trial court did not abuse its discretion in allowing Woodall to relate Jordan's statements.

### *Admissibility of Facts Underlying Aggravating Circumstance*

■ One of the aggravating circumstances relied upon by the State to seek the death penalty was that the defendant had a prior conviction for a felony whose statutory elements included the use of violence to the person. *See* Tenn. Code Ann. § 39-13-204(i)(2) (Supp.1995). In the sentencing phase of the trial, the prosecution presented the testimony of Walter Bush, who was the victim of the defendant's prior violent felony of especially aggravated rob-

bery.[7] Bush testified that on November 11, 1995, he was car-jacked by the defendant and several other men. The defendant asked if Bush would recognize him; although Bush said "no," the defendant shot him in the neck. The defendant objected at trial, and he maintains on appeal that the trial court erred in admitting the facts underlying the prior felony and then allowing the prosecutor to refer to the facts during its closing argument.[8]

In *State v. Bigbee*, 885 S.W.2d 797 (Tenn.1994), we held that it is improper for the prosecutor to introduce evidence or make an argument regarding the facts and circumstances underlying a prior violent felony conviction being used to seek the death penalty where the prior conviction on its face involved violence to the person. In *Bigbee*, the prosecutor introduced the facts of a prior murder committed by the defendant, emphasized the character of the victim of the prior murder in its closing argument, and strongly implied that the death penalty was appropriate because the defendant had already received a life sentence for the prior murder. *Id.* at 811–12. We concluded that the admission of the evidence and the prosecutorial argument improperly enhanced the impact of the aggravating circumstance and affected the jury's determination to the prejudice of the defendant. *Id.* at 812. We therefore remanded the case for a new sentencing hearing. *Id.*

Not every violation of the rule in *Bigbee* requires a re-sentencing. In *State v. Chalmers*, 28 S.W.3d 913 (Tenn.2000), for example, the prosecutor relied upon evidence underlying the defendant's prior convictions for especially aggravated robbery and attempted first degree murder to establish the prior violent felony aggravating circumstance. During the sentencing proceeding, the prosecutor showed that the prior offenses involved a shooting that occurred shortly before the first degree murder for which the defendant was on trial. *Id.* at 916. We concluded that the evidence was introduced to establish the defendant's identification in response to the defendant's contention that he was not involved in the prior offenses and that the prosecutor's argument was not nearly as egregious or extensive as that in *Bigbee*. *Id.* at 917. We therefore held that the evidence and argument did not affect the jury's determination to the prejudice of the defendant. *Id.* at 918–19.

In the present case, as in *Chalmers*, the prosecutor relied upon a prior violent felony, *i.e.*, especially aggravated robbery, that was committed close in time to the first degree murder being tried. The prosecution maintained that the underlying facts were introduced not to bolster the prior violent felony aggravating circumstance, but to establish another aggravating circumstance, *i.e.*, that the killing was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. *See* Tenn. Code Ann. § 39-13-204(i)(6) (Supp.1995). In sum, the State theorized that because the defendant attempted to kill Bush in an effort to avoid arrest or prosecution, the evidence was probative as to the defendant's motive for killing the victim in the present case.

---

7. Bush was also permitted to testify at the guilt phase of the trial. We agree with the Court of Criminals' conclusion that the testimony was properly admitted at the guilt phase of the trial, and we did not order oral argument on that issue.

8. The offense and trial occurred prior to a 1998 statutory amendment which now allows either party to introduce evidence regarding the facts and circumstances of the prior violent felony relied upon by the prosecution to establish the aggravating circumstance. *See* Tenn. Code Ann. § 39-13-204(c) (Supp.1998).

 As the Court of Criminal Appeals observed in this case, it is apparent that the prosecutor's intent was not to unfairly increase the weight of the prior violent felony aggravating circumstance, but rather to establish an entirely separate aggravating circumstance that it was relying upon. Moreover, the prosecutor did not elaborate on or emphasize the underlying facts of the Bush offense during closing argument.[9] For these reasons, this case is remarkably similar to *Chalmers* and substantially different from *Bigbee.* Accordingly, we conclude that the evidence and argument did not affect the jury's determination to the prejudice of the defendant.

### Admissibility of Convictions During Sentencing Phase

The defendant presented numerous family members in the sentencing phase of the trial who testified about his upbringing, background, and church involvement as mitigating evidence for the jury's consideration. During its cross-examination of the defendant's uncle, Randall Stout, the prosecutor asked about the defendant's prior convictions for aggravated burglary, theft, reckless endangerment, and the robbery of Walter Bush. The prosecution asserted that the evidence rebutted the defense's depiction of the defendant as a "fine, active Christian" and impeached the credibility of the mitigating witnesses. The defendant argues that the trial court erred in allowing the prosecutor to use this evidence and in failing to instruct the jury that the evidence was limited to impeachment of the witness.

We begin our review of this issue with Tenn. Code Ann. § 39-13-204(c) (1991 & Supp.1995), which governs the admissibility of evidence during a first degree murder sentencing phase:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. *Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence;* provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

(Emphasis added).

We have recognized that the language of the statute reflects that the rules of evidence do not limit the admissibility of evidence in a capital sentencing proceeding. *See Van Tran v. State,* 6 S.W.3d 257, 271 (Tenn.1999). We have also indicated, how-

---

9. In a related issue, the Court of Criminal Appeals observed that the argument was improper in that it used the Bush offense to contend that the defendant lacked remorse for killing the victim in this case. We agree with the intermediate court that "lack of remorse" is not a statutory aggravating circumstance; moreover, it was not proper rebuttal because the defendant did not argue his remorse as a mitigating factor. In any event, the defense failed to object to the argument, which itself consisted of a brief and non-inflammatory reference. We therefore conclude that the argument did not affect the jury's deliberation to the prejudice of the defendant.

ever, that the statute does not require a court to dispense with the evidentiary principles that are derived from and contained within the rules of evidence. *See State v. Nesbit,* 978 S.W.2d 872, 891 (Tenn. 1998) (evaluating the admissibility of victim impact evidence under Tenn. R. Evid. 403).

In reconciling the application of the statute with the rules of evidence, we have recently clarified "that, in general, § 39-13-204(c) should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence in ruling on the admissibility of evidence at a capital sentencing hearing." *State v. Sims,* 45 S.W.3d 1, 14 (Tenn.2001). We further adopted the following principles:

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive

and unwieldy in the arena of capital sentencing.

*Id.* at 14.

In *Sims,* as in the present case, the prosecution cross-examined the defendant's mitigation witnesses with the defendant's prior convictions for theft and aggravated burglary. *Id.* at 7. In view of our analysis of § 39-13-204(c), we concluded that the trial court was not required to strictly follow the rules governing character evidence under the Rules of Evidence. *Id.* at 13; *see, e.g.,* Tenn. R. Evid. 404, 405. We observed that the prior convictions were relevant to rebut the mitigation evidence offered by the defendant and that their probative value was not outweighed by unfair prejudice to the defendant. *State v. Sims,* 45 S.W.3d at 14. Although the trial court did not instruct the jury that the evidence was limited to rebuttal of the mitigating evidence and impeachment of the defense witness, we concluded that any error did not affect the jury's deliberation to the prejudice of the defendant and did not amount to reversible error. *Id.* at 15.

■ Likewise, in the present case, the trial court was not required to strictly adhere to the rules of evidence in ruling upon the prosecution's use of the defendant's prior convictions for theft, aggravated burglary, and reckless endangerment. The trial court conducted a hearing outside the presence of the jury and found that there was a factual basis for the questions asked by the prosecutor. Although it did not make specific findings, it is implicit that the trial court found that the evidence was probative in terms of rebutting the mitigation evidence offered by the defendant. As we have said, this is entirely proper under Tenn. Code Ann. § 39-13-204(c). The evidence was also probative for the purpose of impeaching the testimony

of Randall Stout with regard to his opinion of the defendant's character.

■ Although the trial court did not give a limiting instruction on the jury's consideration of this evidence, it is clear from the record that the prosecution used the evidence to rebut the mitigating evidence and to impeach the defense witness and not to introduce evidence of a non-statutory aggravating circumstance. Accordingly, we conclude that the evidence was properly admissible under the circumstances of this case and that the failure to give a limiting instruction did not affect the jury's decision to the prejudice of the defendant.

### *Exclusion of Mitigating Evidence*

During the sentencing phase of the trial, the defendant sought to introduce testimony from Rico Bowers and Vassy Gandy in an effort to show that his own involvement in the offenses was minor. The defendant also sought to call Chaplain Carl Nelson to testify about gang culture and a gang's practice of blaming criminal offenses on former members.[10] The trial court excluded the evidence after finding that the defendant was attempting to re-litigate the issue of guilt. The Court of Criminal Appeals held that the evidence was admissible, but that its exclusion was harmless beyond a reasonable doubt.

The United States Supreme Court has held that the 8th and 14th amendments to the United States Constitution require that the jury in a death penalty case be permitted to consider mitigating evidence, which includes "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). Likewise, we have held that article I, §§ 8 and 16 of the Tennessee Constitution require that the jury not be prevented from hearing evidence about the defendant's background, record, and character, and any circumstances about the offense that may mitigate against the death penalty. *See State v. Cauthern,* 967 S.W.2d 726, 738 (Tenn.1998).

In addition to the constitutional provisions, the statutory scheme in effect at the time of the defendant's offense provided:

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances . . . ; and any evidence tending to establish or rebut any mitigating factors.

Tenn. Code Ann. § 39-13-204(c) (Supp. 1995). In addition, the statutes specifically included as a mitigating factor that a defendant "was an accomplice in the murder committed by another person and the defendant's participation was relatively minor." *Id.* § 39-13-204(j)(5) (Supp.1995).

■ Given these controlling principles, we conclude that the trial court erred in simply determining that the proposed mitigating evidence was inadmissible. In short, the defendant's theory was that the

---

**10.** The defendant also sought to admit testimony from Randall Stout regarding why the defendant had tattoos, but the trial court sustained the prosecution's objection that the evidence was hearsay. As we have indicated, the Rules of Evidence do not govern the admissibility of evidence under Tenn. Code Ann. § 39-13-204(c). We are unable to review the effect of any potential error, however, inasmuch as the defendant did not make an offer of proof.

evidence may have demonstrated that he played a minor role in the offenses, which may have not only established a mitigating factor, but also rebutted the felony murder aggravating circumstance, which requires a defendant to have played a "substantial role." Thus, evidence supporting this theory was admissible.

The problem with the defendant's theory, however, is that Bowers and Gandy, like the accomplices who testified during the guilt phase, inculpated the defendant as the one who led the offenses and shot the victim. Moreover, the defense made no proffer indicating that the testimony of Bowers or Gandy would differ from these statements. Bowers in particular was unlikely to have testified that he shot the victim as alleged by the defendant. Indeed, in the absence of a proffer, the defendant simply contends that Bowers and Gandy would have had to be impeached with their prior statements, further rendering the proposed mitigating evidence of dubious value.

Likewise, the testimony of an expert on gang culture, who did not know the defendant or any of the gang members, would have conflicted with the defendant's statement to police in which he admitted being a member of the gangster disciples. Moreover, there was other evidence regarding the defendant's theory that he was falsely accused by gang members because he was a former member, and it was obviously rejected by the jury.

Accordingly, we agree with the Court of Criminal Appeals' conclusion that the ex-clusion of the mitigating evidence did not affect the jury's decision to the prejudice of the defendant and was shown to be harmless beyond a reasonable doubt. *See State v. Cauthern,* 967 S.W.2d at 738–39.

## Application of Felony Murder Aggravating Circumstance

■ Although not challenged by the defendant, the Court of Criminal Appeals held that the felony murder aggravating circumstance set forth in Tenn. Code Ann. § 39-13-204(i)(7) (Supp.1995) was properly applied by the jury even though the defendant was convicted of felony murder. We have elected to address this issue as well, and we agree with the Court of Criminal Appeals.

In *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), this Court addressed the application of the felony murder aggravating circumstance to seek the death penalty for the offense of felony murder.[11] We said that an aggravating circumstance must provide "a principled way to distinguish the case in which the death penalty was imposed from the many cases in which it was not ... and must differentiate a death penalty case in an objective, even-handed, and substantially rational way from the many murder cases in which the death penalty may not be imposed." *Id.* at 343 (citations omitted). We reasoned that because the elements of the felony murder aggravating circumstance mirrored the elements of the offense of felony murder, its application failed to achieve this narrowing of death-eligible offenders and therefore

---

**11.** Prior to July 1, 1995, felony murder was "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate[,] any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." *See* Tenn. Code Ann. § 39-13-202(a)(2) (1991). At that time, the felony murder aggravating circumstance was applicable when "[t]he murder was committed while the de-fendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb." *Id.* § 39-13-204(i)(7) (1991).

violated article I, § 16 of the Tennessee Constitution. *Id.* at 346.

Under present law, however, which became effective July 1, 1995, felony murder occurs when one is killed in the perpetration of any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, or aircraft piracy. Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 1995). In contrast, the present felony murder aggravating circumstance, which became effective on May 30, 1995, provides that it applies where the murder:

> was *knowingly* committed, solicited, directed, or aided by the defendant, while the defendant had a *substantial role* in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

*Id.* § 39-13-204(i)(7) (Supp.1995) (emphasis added).

Unlike the statutes analyzed in *Middlebrooks,* the present versions of felony murder and the felony murder aggravating circumstance do not duplicate the elements of one another. The aggravating circumstance applies only where the jury finds that a defendant acted *knowingly* and had *a substantial role* in the offense. The additional elements were not in the prior version of the felony murder aggravating circumstance. In short, the present statutory scheme eliminates the duplication that was at issue in *Middlebrooks* and thus achieves the constitutionally required narrowing of death-eligible offenders convicted of felony murder. We therefore hold that the jury's application of Tenn. Code Ann. § 39-13-204(i)(7) (Supp.1995) was constitutionally proper and appropriate under the facts of this case.

### *Proportionality*

■ Where a defendant has been sentenced to death, we must undertake a comparative proportionality review pursuant to Tenn. Code Ann. § 39-13-206(c)(1) (1997). The analysis is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." *State v. Bland,* 958 S.W.2d at 662 (quoting *Pulley v. Harris,* 465 U.S. 37, 42–43, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. *Id.* at 668; *see also State v. Burns,* 979 S.W.2d 276, 283 (Tenn.1998).

■ This Court has consistently employed the precedent-seeking method of comparative proportionality review, which compares a case with cases involving similar defendants and similar crimes. *See Bland,* 958 S.W.2d at 667. We consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. *Id.* at 667. We also consider multiple factors about the defendant: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. *Id.* Since no two defendants

and no two crimes are precisely alike, our review is not mechanical or based on a rigid formula. *See id.* at 668.

 In reviewing the facts and circumstances of the offense, the evidence shows that the defendant and three accomplices were driving around when the defendant saw the victim in her car and said, "I'm going to get that whore." The four men followed the victim for five or ten minutes and then pulled behind her when she stopped her car. The defendant accosted the victim, grabbed her by her hair, held a gun to her stomach, and forced her into the backseat of her car with Quentin Jordan. The defendant told the victim that she was "with the devil" and that he would have to kill her because she could recognize him. When they got out of the car, the defendant hugged the victim and then fired a single shot into her head. The defendant and Jordan removed items from the victim's car, wiped off their fingerprints, and fled from the scene, leaving the victim for dead. The victim never regained consciousness and died approximately two days later. The defendant initially denied any knowledge of the events before giving a statement that implicated another as the shooter.

In reviewing the record with regard to the defendant, the evidence showed that the defendant, an African-American male, was 20 years of age at the time of these offenses. The defendant had a prior conviction for the violent felony of especially aggravated robbery during which he shot an unarmed victim; the offense occurred just days after the defendant killed the victim in this case. The defendant presented numerous witnesses in mitigation who testified about his upbringing and background. Although abandoned by his mother as an infant, the defendant was raised by his grandmother in a supportive and loving family environment that encouraged his involvement in church activities. The defense witnesses indicated that the defendant had again turned to religion and could be rehabilitated if spared from the death penalty.

As the State asserts on appeal, this Court has upheld the death penalty in many cases bearing similarities to this one. In the following cases, for example, the victims were shot in the course of a robbery or kidnapping. *State v. Chalmers,* 28 S.W.3d at 919; *State v. Smith,* 993 S.W.2d 6 (Tenn.1999); *State v. Burns,* 979 S.W.2d 276 (Tenn.1998); *State v. Howell,* 868 S.W.2d 238 (Tenn.1993); *State v. Evans,* 838 S.W.2d 185 (Tenn.1992); *State v. Bates,* 804 S.W.2d 868 (Tenn.1991); *State v. Boyd,* 797 S.W.2d 589 (Tenn.1990); *State v. King,* 718 S.W.2d 241 (Tenn.1986). In many of these cases, like the present case, the victim was selected at random.

Similarly, the Court has repeatedly upheld death sentences in which the prior violent felony aggravating circumstance was applied by the jury. *See State v. Chalmers,* 28 S.W.3d at 919; *State v. Smith,* 993 S.W.2d at 18; *State v. Cribbs,* 967 S.W.2d at 776; *State v. Howell,* 868 S.W.2d at 262; *State v. King,* 718 S.W.2d at 248, among others. The Court has likewise upheld death sentences in which one of the aggravating circumstances was that the killing was committed to avoid arrest or prosecution. *See State v. Bush,* 942 S.W.2d 489, 504 (Tenn.1997); *State v. Smith,* 857 S.W.2d 1, 14 (Tenn.1993); *State v. Evans,* 838 S.W.2d at 188; *State v. Thompson,* 768 S.W.2d 239, 252 (Tenn.1989), among others. Finally, as we have said, the application of the felony murder aggravating circumstance was appropriate under present law even though the defendant was convicted of felony murder.

In considering characteristics regarding this defendant, it appears that we have upheld the death sentence in several cases

where the defendant was roughly the same age as the defendant or had presented similar mitigating evidence. *See State v. Burns,* 979 S.W.2d at 283; *State v. Pike,* 978 S.W.2d 904, 919 (Tenn.1998); *State v. Cauthern,* 967 S.W.2d at 740–41; *State v. Hall,* 958 S.W.2d 679, 700 (Tenn.1997); *State v. Bland,* 958 S.W.2d at 670; *State v. Van Tran,* 864 S.W.2d 465, 482 (Tenn. 1993). In sum, our review requires a determination of whether a case plainly lacks circumstances found in similar cases where the death penalty has been imposed. *See State v. Burns,* 979 S.W.2d at 285. The similarity of the facts and circumstances of this case to numerous cases in which the death penalty has been upheld reveals that the death sentence is not arbitrary or disproportionate as applied in this case.

The dissent asserts that the majority's comparative proportionality analysis is flawed in that it fails to assure that a disproportionate sentence of death will be set aside. A majority of the Court has already addressed and rejected the views of the dissent and has consistently adhered to the proportionality analysis carefully detailed in *Bland. See State v. Keen,* 31 S.W.3d 196, 223–24 (Tenn.2000). Moreover, the dissent in no way asserts or establishes that the sentence of death is either arbitrary or disproportionate as applied in this case to this defendant.

### Conclusion

In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the evidence supports the jury's finding of the statutory aggravating circumstances; that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt; and that the sentence is not arbitrary, excessive, or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge John Peay and joined in by Judge Norma McGee Ogle and Judge Alan E. Glenn. The relevant portions of that opinion are attached as an appendix to this opinion. The defendant's sentence of death is affirmed and shall be carried out on the 25th day of September, 2001, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of appeal are taxed to the State.

### *APPENDIX*

(Excerpts from the Court of Criminal Appeals' Decision)

Filed May 24, 2001

### IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON

OCTOBER 1999 SESSION

STATE OF TENNESSEE, Appellee,

v.

JAMES P. STOUT, Appellant.

C.C.A. NO. 02C01 9812 CR 00376

SHELBY COUNTY

HON. JOSEPH B. DAILEY,

(Capital felony murder; especially aggravated robbery; especially aggravated kidnapping)

FOR THE APPELLANT:

ROBERT C. BROOKS (On appeal), William D. Massey, (On appeal and at tri-

al),Danese K. Banks, (At trial), Memphis, TN.

FOR THE APPELLEE:

Paul G. Summers, Attorney General & Reporter, Michael E. Moore, Solicitor General, Joseph F. Whalen, Asst Attorney General, Nashville, John W. Pierotti, District Attorney General, Jerry Harris, Lee Coffee, Asst. District Attorneys General, Memphis.

OPINION FILED:

AFFIRMED

JOHN H. PEAY, Judge

## O P I N I O N

### [Deleted Summary of Facts and Testimony]

### I. ALLEGED *BATSON* ERROR

On his ninth peremptory challenge, defendant struck juror Moore from the venire. The State objected to defendant's challenge, alleging a violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Following a lengthy hearing outside the presence of the venire, the trial court sustained the State's objection and reseated Moore on the panel. Defendant now challenges the trial court's ruling that he struck a juror for unconstitutional reasons.

In *Batson*, the United States Supreme Court held that, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. at 89, 106 S.Ct. 1712. In *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), *Batson* was extended to prohibit defendants from striking jurors on the basis of their race. To trigger an analysis of a defendant's peremptory strike, the State must first establish a *prima facie* case that the juror is being challenged on the basis of his or her race. *Georgia v. McCollum*, 505 U.S. at 59, 112 S.Ct. 2348. Once the State has done so, the defendant must then articulate a race-neutral reason for challenging the juror. *Id.* Once the defendant does so, the trial court must then determine whether the State has established purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

In this case, defendant had exercised nine peremptory challenges in seven rounds. The first juror challenged was black; the remaining eight were white (defendant is black). The State objected upon the defendant striking his eighth consecutive white juror. In finding that the State had established a *prima facie* case of racial discrimination, the trial court noted that the only black juror challenged by defendant was an employee of the Shelby County Correctional Center; that the remaining eight challenges had been against white jurors; and that in seven rounds of challenges, defendant had not once passed the jury. The court then directed defendant to articulate his race-neutral reason for excusing juror Moore.

Defense counsel responded that he challenged Moore because she was "not responsive;" was not making eye contact with him; that she appeared "very stern;" and that she was a teacher. Defense counsel stated that the predominant reason for the challenge was Moore's demeanor toward him. The court pointed out that a black teacher had not been challenged, and expressed doubt that Moore's demeanor was the type of race-neutral reason contemplated by *Batson*. Defense counsel denied knowing that the black juror he had not challenged was a teacher, and added that his challenge of Moore "had to do with [her] lack of responsiveness." The court replied that Moore had responded to every question that she had been asked by

the court, by the State, and by defense counsel. Finally, defense counsel stated his concern that Moore taught at the school which defendant had attended, and that the facts of the case might reflect badly on her school. He also noted, however, his reliance on his "experience and instinct" as trial counsel.

The court responded that,

viewing the jurors that have been excused by the defense, the answers they've given, the employment they have, the lack of red flags, if you will, that exist in this case with regard to the answers they've given with regard to being married to a police officer or being the recent victim of a violent crime or anything of that sort, leads one to conclude, I think a person would have to be blind if they didn't start looking real skeptically at why exactly these eight people have been challenged.

It sure starts to look like they're being challenged because they're Caucasian.... There've been eight in a row without any real articulable reason other than some vague general statements and conclusions.

. . . .

And at this point, unless there can be some further reason articulated to convince me otherwise, I am not satisfied that the reasons given sufficiently articulate a race neutral explanation for [Moore] being challenged.

Defendant contends that the trial court erred by not accepting his proffered race-neutral reasons at face value and then requiring the State to prove purposeful discrimination. He argues that the trial court completed only the first two steps of the *Batson* analysis, and that he is there-

fore entitled to a new trial. We respectfully disagree.

Defendant relies heavily on *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). In that case, the defendant objected to the prosecutor's use of peremptory challenges to strike two prospective black jurors. In response, the prosecutor explained that he didn't like their haircuts or their facial hair. The trial court overruled the defendant's objection without explanation. On eventual appeal in federal court, the Court of Appeals for the Eighth Circuit concluded that the trial court had erred.[1] The Court of Appeals held that the prosecutor had not articulated a legitimate race-neutral reason for the strikes.

The U.S. Supreme Court reversed the Court of Appeals, finding that *it* (not the trial court) had erred by requiring that the race-neutral reason articulated by the proponent of the strike be at least plausible. It found that the trial court had properly proceeded to the third part of the inquiry, in which it ruled that the prosecutor was not motivated by discriminatory intent. The Supreme Court found that the Court of Appeals had erred in its review of the trial court's decision because it "did not conclude or even attempt to conclude that the [trial] court's finding of no racial motive was not fairly supported by the record.... It gave no proper basis for overturning the state court's finding of no racial motive, a finding which turned primarily on an assessment of credibility." *Id.* at 769, 115 S.Ct. 1769. In effect, the Court of Appeals was impermissibly substituting its judgment for that of the trial court, and improperly adding a requirement to the second step of the *Batson* analysis.

This case is distinguishable from *Purkett*. We are not reviewing an appellate

---

1. The case was being appealed on defendant's petition for writ of habeas corpus.

court's decision to substitute its findings of fact for those of the trial court. Rather, we are reviewing the trial court's lengthy findings after it heard substantial argument on this issue from both the State and the defendant. *Cf. U.S. v. Tucker*, 90 F.3d 1135, 1142 (6th cir.1996) (where proponent of strike provided an inherently believable explanation and the opponent offered no rebuttal, the trial court did not commit clear error in overruling the opponent's objection). The issue is whether the State established by a preponderance of the evidence that defendant's strike of Moore was intentionally discriminatory. *Id.* We acknowledge that some of the trial court's language in this case appears to indicate that it simply rejected a facially race-neutral explanation offered by the defendant. *Cf. Purkett v. Elem*, 514 U.S. at 768, 115 S.Ct. 1769 (The race-neutral explanation need not be persuasive, or even plausible. Unless a racially discriminatory intent is inherent in the proponent's explanation, the reason offered will be deemed race neutral.) However, despite the imprecise phraseology used by the trial court, the record makes clear that the court engaged in the required in-depth analysis of all the circumstances before reseating Moore on the jury, and did not impermissibly shift the burden of persuasion to the defendant. The court took pains to articulate its findings on the record, and it had the opportunity-which we do not-to assess the demeanor of the prospective juror and defense counsel, and to evaluate their credibility. On appeal, this Court accords great deference to the trial court's findings, and will not set them aside unless clearly erroneous. *State v. James E. Hathaway*, No. 02C01 9702 CR 00082, 1997 WL 793505, Shelby County (Tenn. Crim. App. filed Dec. 30, 1997, at Jackson), *perm. appeal denied* (Tenn.1998). *See also State v. Butler*, 795 S.W.2d 680, 687 (Tenn.Crim.

App.1990) (where a trial court's findings upon a *Batson* challenge are based on the credibility of witnesses, the standard of review is whether the trial court's decision was clearly erroneous).

We find this Court's analysis in *State v. James E. Hathaway* to be instructive:

Although a trial court must accept a facially race-neutral explanation for purposes of determining whether the proponent has satisfied his burden of production, this does not mean that the court is bound to believe the explanation in making its [final] determination. In other words, while the court may find that a proffered explanation is race-neutral, the court is not required, in the final analysis, to find that the proffered explanation was the actual reason for striking the juror. If the court determines that a race or gender based motive was behind the challenge, the juror may not be excluded.

In making its determination, the trial court must look to the totality of the circumstances for rarely will a party admit that its purpose in striking a juror was discriminatory. Accordingly, the trial court may infer discriminatory intent from circumstantial evidence. *'The factfinder's disbelief of the reasons put forth by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination, and ... no additional proof of discrimination is required.'* Additionally, the court may consider whether similarly situated members of another race were seated on the jury or whether the race-neutral explanation proffered by the strikes' proponent is so implausible or fantastic that it renders the explanation pretextual. The trial court may also consider the demeanor of the attorney who exercises

the challenge which is often the best evidence of the credibility of his proffered explanations.

(emphasis added) (citations omitted). *See also U.S. v. Ledford,* 127 F.3d 1103, 1997 WL 659673 (6th Cir.1997) (trial court "has the power to disbelieve even a race-neutral explanation offered by the prosecution").

The record supports the trial court's ruling in this case. Defendant struck eight white jurors consecutively. *See Batson,* 476 U.S. at 97, 106 S.Ct. 1712 ("a 'pattern' of strikes against ... jurors [of a particular race] ... might give rise to an inference of discrimination.") The only black juror defendant struck worked for the Division of Corrections. The defendant's explanation for striking Moore rested primarily on Moore's demeanor, and the trial judge was in a much better position to evaluate both Moore's demeanor and defense counsel's credibility than is this Court. The trial judge's findings are not clearly erroneous, and this issue is therefore without merit.

## [DELETED: II. CORROBORATION OF ACCOMPLICE TESTIMONY]

## III. TRIAL COURT'S RULINGS ON PROFFERED DEFENSE PROOF

Defendant complains that the trial court repeatedly stymied his attempts to present his theory of defense, thereby violating his constitutional rights.[2] Defendant's theory was that he had once been a member of the Gangster Disciples gang, but had been "beaten out" of it in 1993 while he was in jail. As a result, he became an outsider and scapegoat for gang activity. Defendant wanted to prove that gang members Bowers, Gandy and Jordan actually committed

the kidnapping, robbery and murder of Hunter; that lower ranking gang members Carmichael and Terrell agreed to "take the rap" for Bowers and Gandy; and that they all agreed to point the finger at him, the outsider, as the actual perpetrator of the crimes. In support of his theory, defendant wanted to introduce the initial statements that Bowers and Gandy made to the police, in which they claimed to have been present at the scene; the testimony of Makimba Fowler, a Gangster Disciple member who had been in jail with defendant and was familiar with the "beating out" ritual practiced by the gang; an incident report prepared by jailer Donald Justus after defendant got a black eye in 1993; and the testimony of Carl Nelson, an expert on gangs and gang-related activities, who would have testified about the gang practices of blaming crimes committed by gang members on non-members, and of lower-ranking gang members stepping forward to accept the consequences of higher-ranking members' activities.

Defendant initially ran into trouble presenting his theory of defense during opening statement. When his lawyer referred to his mother giving him to his grandmother at two weeks of age, the State objected. There followed a long discussion outside the jury's presence, during which defense counsel described in some detail both the theory of defense and the supporting proof. While reserving its evidentiary rulings, the court expressed concern over the admissibility of much of the proffered proof. Eventually, the court ruled that events occurring in June 1993 were too remote in time to be relevant to defendant's actions in November 1995:

Even if [defendant had been beaten out of the gang in 1993], he could have been in and out of the gang ten more times

**2.** Defendant cites to the Sixth and Fourteenth Amendments to the United States Constitution, and to Article I, Sections Eight and Nine of the Tennessee Constitution.

between June of '93 and November of '95. He could have had a dozen different meetings with gang members of ten different gangs. And who knows what he could have done during those two and a half years that-that intervening circumstances might have made the '93 incident totally irrelevant to the '95 activity. Accordingly, the court ordered defendant to confine his opening statement to the events that related to Amber Hunter's killing on November 8, 1995.

The trial court also ruled that defense counsel should not refer during opening statement to Gandy and Bowers' initial statements to the police, in which they admitted participating in the events leading to Hunter's death. Defense counsel wanted to introduce these statements via the police reports containing them. The State pointed out the hearsay problem with this proof,[3] and the trial court inquired whether counsel intended to call Bowers and Gandy to the stand. Defense counsel refused to commit to calling these witnesses. The trial court ruled that no mention should be made of these statements during opening statement unless counsel planned to call Bowers and Gandy to testify.

Our Supreme Court has held that opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, *the facts each party intends to prove.*" *Harris v. Baptist Memorial Hospital,* 574 S.W.2d 730, 732 (Tenn. 1978) (emphasis added). In a trial, facts can be proven only by admissible evidence. Opening statements should not be used by either side as opportunities to present

speculation and conjecture which is unsupported by admissible proof. And while a trial court should not make evidentiary rulings during opening statement, it may use its discretion to exclude from opening statements assertions which it deems unlikely to be supported by admissible evidence. Absent an abuse of that discretion, this Court will not overturn a trial court's ruling in that regard. *See State v. Kimberly Wolfe,* C.C.A. No. 122, Sevier County (Tenn. Crim. App. filed Mar. 13, 1991, at Knoxville), *perm. appeal denied* (Tenn. 1991) (standard governing trial court's control of both opening statement and closing argument is abuse of discretion). We find no such abuse of discretion here. This issue is without merit.

Defendant also complains that the trial court improperly limited his cross-examination of Officer Hightower. On November 20, 1995, Hightower took statements from Bowers and Gandy. After taking these statements, Hightower noted in his report that "both statements from Bowers and Gandy provided numerous details that only parties responsible could have known." When defense counsel asked Hightower about this notation, the State objected. The court sustained the objection on the grounds that defense counsel was attempting to ask about the content of Bowers and Gandys' statements, which was hearsay. *See* Tenn. R. Evid. 801.

The trial court should have allowed defense counsel to ask Hightower about his own conclusions regarding his investigation of the case. Such questions, properly asked, would not have called for hearsay. However, the trial court's error in this regard was harmless. While Hightower may have initially concluded that Bowers and Gandy had been involved in the crimes

---

**3.** Police reports are hearsay and not admissible under the public records exception to the hearsay rule. Tenn.R.Evid. 801; 803(8).

against Hunter, subsequent events led the State to conclude that they were not. Hence, they were not charged in the indictments. Had Hightower been allowed to testify about his initial conclusions, the State would have been entitled to question him about whether and why he later changed those conclusions. Viewing the record as a whole, we do not find that the trial court's error in this regard more probably than not affected the judgment or resulted in prejudice to the judicial process. *See* Tenn. R. App. P. 36(b). Accordingly, this issue is without merit.

Defendant also complains that the trial court erred in ruling that the proffered testimony of Makimba Fowler, Carl Nelson and Lieutenant Justus was inadmissible. He claims that the court's ruling prevented him from proving that he had been beaten out of the Gangster Disciples in 1993, thereby becoming an outsider to be used as a "throwaway" and framed for the crimes committed by other gang members against Amber Hunter. We respectfully disagree.

According to defense counsel's statements to the court during the guilt phase of the trial, Fowler was with defendant in jail in June 1993, but did not remember seeing defendant being beaten. All Fowler could testify to, according to defense counsel, was that Gangster Disciple members would expel other members by throwing a sheet over their head and beating them.[4] Lieutenant Justus was one of defendant's jailers in June 1993, and prepared a report when defendant appeared with a bruised eye and was sent to the medical department. Justus did not see how defendant got the bruised eye. Nelson was proffered

as an expert in Gangster Disciple activities, familiar with the gang practice of blaming non-members for crimes committed by members.

The trial court correctly ruled that this proof was irrelevant absent some proof that *defendant* had been beaten out of the gang, and remained an outsider at the time Amber Hunter was kidnapped, robbed and murdered. According to defense counsel, Fowler could not testify to this; nor could Justus; nor could Nelson. All they could testify to was that defendant got a black eye while he was in jail; that members of the Gangster Disciples expelled other members through beatings; and that gang members blamed non-members for their own criminal activity. There was simply no proof proffered or admitted during the guilt phase of the trial that defendant had been subjected to this treatment. Indeed, the only evidence admitted during the guilt phase of the trial regarding defendant's gang affiliation was to the contrary. Officer Hightower testified that when he initially questioned defendant on November 21, 1995, defendant admitted to being a member of the Gangster Disciples. Jordan also testified that defendant was a member of the gang. If the uncontroverted proof established that defendant was a member of the gang in November 1995, any proof regarding what happened to non-members was utterly irrelevant. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. Thus, the trial court did not err in its ruling on the proffered proof, and this issue is without merit.

Defendant next alleges that, after the trial court prevented him from proving his theory of defense, the State was permitted to point out his lack of evidence during

4. At the sentencing hearing, Fowler testified that he did remember seeing defendant being beaten out of the Gangster Disciples gang. Fowler also testified that he had never before spoken with defense counsel, and defense counsel expressed surprise at Fowler's testimony.

closing argument, thereby impermissibly shifting the burden of proof to him. The State disagrees.

Defense counsel maintained during closing argument that defendant was being blamed as the "new kid on the block," and that the witnesses' stories were inconsistent because two of them hadn't actually been at the crime scene. He argued that the witnesses testified in order to get favorable plea bargains; that the State elicited testimony "needed to point the finger at [defendant] ... like all the Gangster Disciples want ... [b]ecause it solves the case;" and that "[t]he State's case is built on the shifting sands of these people's lies."

On rebuttal, the State responded that, "the problem with [defense counsel's] whole theory, his whole argument, is that he hasn't given you any proof of anything.... Not one scintilla of proof that indicates that what he just told you is true." On defendant's objection that the State was arguing that defendant had a burden of proof to meet, the court ruled that the State's argument was proper rebuttal.

The trial court has wide discretion in controlling the argument of counsel. *Smith v. State,* 527 S.W.2d 737, 739 (Tenn.1975). This Court will not interfere with the exercise of that discretion absent an abuse thereof. *Id.* We see no such abuse here. The State's rebuttal argument did not impermissibly shift the burden of proof to defendant. Rather, it was merely comment on the evidence in the record (or not). The jury was instructed that the argument of counsel was not evidence, and that the State bore the burden of proving its case beyond a reasonable doubt. The jury is presumed to follow its instructions. *State v. Blackmon,* 701 S.W.2d 228, 233 (Tenn. Crim.App.1985). This issue is without merit.

## IV. TRIAL COURT'S REFUSAL TO REVIEW STATEMENT

Defendant contends that the trial court erred by refusing to conduct an *in camera* review of Harold Gray's statement. Gray made his statement to the police on November 25, 1995, after Bowers' and Gandy's first statements. Defendant theorized that the police had "collaborated with each other," taking information from Bowers' and Gandy's initial statements and "roll[ing] over a lot of what they said into everybody else's statements." Defendant argued that his theory would be supported if "that same verbiage appears in subsequent statements." Thus, defendant requested the court under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to examine Gray's statement for evidence of the alleged police subterfuge. The trial court refused after the State represented that the statement did not include anything "that would be even arguably exculpatory."

The defendant cites us to no Tennessee authority for the proposition that the trial court abused its discretion by refusing to review the statement, and we decline to hold that it did so. Moreover, out of an abundance of caution in this capital case, this Court has reviewed Gray's statement. It contains no information which would have required its disclosure to defendant under *Brady* (or which supports defendant's theory). This issue is without merit.

## V. & VI. ADMISSIBILITY OF DEFENDANT'S PRIOR CONVICTION

### A. As impeachment evidence

In 1993, defendant was convicted of theft of property, reckless endangerment, and two aggravated burglaries. He was also convicted in January 1997 of especially aggravated robbery. This conviction

arose out of an armed carjacking that defendant committed with Bowers and Gandy [5] against Walter Bush on November 11, 1995, in Memphis. Prior to trial, the court conducted a hearing to determine whether the State could use any of these convictions to impeach the defendant's credibility if he testified. *See* Tenn. R. Evid. 609(a)(3). The court ruled that the State could not refer to the reckless endangerment conviction, but would be allowed to refer to the other four convictions. Defendant now argues that the trial court erred in its ruling on the especially aggravated robbery conviction.

A prior conviction may not be used for impeachment purposes if the unfair prejudicial effect of the conviction on the substantive issues outweighs its probative value on the accused's credibility. Tenn. R. Evid. 609(a)(3). Defense counsel argued that the prior conviction was so similar in nature to the instant offense that the prejudicial effect outweighed the probative value. The trial court disagreed, finding that "the probative value is substantial in light of the nature of the offense and how recent in time it is."

When conducting the balancing test required by 609(a)(3), the trial court should first analyze the relevance of the prior conviction to the accused's credibility. *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). If the conviction is probative of the accused's credibility, then the trial court should assess the similarity between the crime underlying the prior conviction and the crime which is being tried. *Id.* Where the two are substantially similar, the court "should carefully balance the probative value of the impeaching conviction on credibility against its unfairly prejudicial effect on substantive issues." *Id.*

Contrary to defendant's assertions, the trial court in this case did "carefully balance" the necessary criteria. It correctly determined that especially aggravated robbery is a crime of dishonesty, and is therefore probative of the defendant's credibility. *See, e.g., State v. Goad*, 692 S.W.2d 32, 37 (Tenn.Crim.App.1985). We further agree with the trial court that, because the crime underlying this prior conviction was more recent in time to the trial than the 1993 offenses, the probative value of this prior conviction was enhanced. The trial court correctly acknowledged that the similarity between the two crimes had to be considered in the balancing process, but further correctly noted that similarity does not automatically preclude using the prior conviction. *See State v. Blevins*, 968 S.W.2d 888, 893 (Tenn.Crim.App.1997).

We review the court's decision on this issue for abuse of discretion. *Id.* at 892. No abuse of discretion having been shown, this issue is without merit.

### B. As substantive evidence

After the State concluded its case in chief, defendant indicated that he intended to call Bowers and Gandy to testify. Defendant wanted to question Bowers and Gandy about their initial statements in which they admitted being present during the attack on Hunter. By calling these witnesses, defendant wanted to advance his theory of being taken along by Gangster Disciples in order to be blamed for their own criminal activities. Defense counsel renewed a motion *in limine* to prevent the State from questioning these witnesses about the Bush carjacking. The State op-

---

5. Bowers and Gandy each pled guilty to aggravated robbery in connection with this offense.

posed defendant's motion, arguing it should be allowed to rebut defendant's proof with evidence of his continued participation in activities with these alleged gang members. Defendant now contends that the trial court erred in denying his motion *in limine.*

Prior to ruling, the trial court held a jury-out hearing pursuant to Tennessee Rule of Evidence 404(b), which provides

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The court heard lengthy argument from counsel; the testimony of Bowers; an offer of proof of the victim Bush's testimony; and reviewed the statement defendant made in the Bush carjacking. The court then found that the two crimes were sufficiently identical to support the inference that the defendant had been involved in both of them. It further found the existence of material issues other than conduct conforming to a character trait, to wit: identification of who shot Amber Hunter; intent; and guilty knowledge. Finally, the court found that the probative value of this proof "clearly outweigh[ed] any prejudicial effect."

The trial court complied substantially with the procedural requirements of 404(b). Accordingly, this Court reviews its ruling for abuse of discretion. *State v. DuBose,* 953 S.W.2d 649, 652 (Tenn.1997). We find no such abuse.

We agree with the trial court that the Bush carjacking was substantially identical to the attack on Hunter. Bowers testified that he, Gandy and defendant drove up beside Bush as he sat in his parked car. Defendant got out of the car they were in and made Bush get out of his car. Bowers then got in the victim's car while Gandy stayed in the original vehicle. While Bowers sat in the victim's car, he heard a gunshot. Defendant then returned to the car Gandy was driving, and with Bowers following in the victim's car, they all returned to the Springcreek apartments. Bowers abandoned Bush's car there. The offer of proof of Bush's testimony established that Bush had parked his car at about five o'clock in the morning. Defendant and either Gandy or Bowers approached him, both of them armed. Defendant shot him in the neck as he tried to run, and the men then took his car.

According to defendant's statement, he was riding with Bowers and Gandy when they pulled up beside Bush's car. He and Bowers approached Bush as he was leaving his vehicle, and Bowers told him to drop the keys. Bowers stated to Bush that he had seen his face, and Bush tried to run. According to defendant, Bowers then shot Bush. Defendant returned to the original car, and Bowers got into Bush's car. Bowers followed them back to the Springcreek apartments. Defendant admitted in his statement that he was an "inactive member" of the Gangster Disciples.

The identity of Hunter's shooter was the key issue in this case. Given the similarity of the Bush carjacking with Hunter's attack, proof of this other crime was relevant

to prove that the same person pulled the trigger both times. "An inference of identity arises when the elements of the [other] offense and the charged offense are sufficiently distinctive that one can conclude that the person who committed the [one] also committed the [other]." *State v. Electroplating, Inc.,* 990 S.W.2d 211, 224 (Tenn.Crim.App.1998). "[I]t is not required that the other crime be identical in every detail to the offense on trial. The evidence must support the inference that the defendant, who committed the [other] acts, is the same person who committed the offense on trial." *Id.* (citations omitted). Thus, proof of the Bush carjacking was properly admitted to prove identity.

It was also properly admitted to show defendant's guilty knowledge and intent. Defendant maintained that he was present when Hunter was kidnapped, robbed and killed, but that he did not have any knowledge that these crimes were going to be committed, and that he did not intend for these crimes to occur. That he was out riding around with the very same people he claimed committed the Hunter crimes just a few hours later, during which a strikingly similar crime was committed, serves to undercut his protestations of innocent presence.

This issue is without merit.

### [DELETED: VII. ADMISSION OF HEARSAY STATEMENTS]

### VIII. DEFENDANT'S THREAT AGAINST WITNESS

On cross-examination, defense counsel asked Woodall if she had been "forced to testify;" if she had been threatened with criminal charges if she didn't make a statement to the police about the Hunter crimes; and whether she had been threatened "to make [her] testify" at the trial.

Woodall responded that only God had forced her to testify; that she had been threatened with criminal prosecution if she did not make a statement to the police; but that no one had threatened her to make her testify. On redirect, the State inquired as to whether anyone from the prosecution had threatened her in order to make her testify, and Woodall responded in the negative. The State then asked her if she was scared. She responded, "Yes, I am," and the State asked of whom she was afraid. Woodall replied that she was afraid of defendant because of threats he had made against her and her family if she testified.

Defense counsel objected on the grounds that this aspect of redirect exceeded the scope of his cross-examination. He argued that he had only explored threats made by the State in order to intimidate Woodall into testifying against the defendant; that he had not broached the subject of threats by anyone else. The court found that defense counsel's line of questioning implied that someone from "the system" had forced her to testify, and ruled that the State was entitled to rebut defense counsel's implication, "to the extent that they have proof." Defendant now contends that the trial court's ruling was in error.

We respectfully disagree. As candidly noted by defendant in his brief, defense counsel was implying through his cross-examination of Woodall that she "was testifying falsely against the defendant because she had been threatened by the prosecutors or the police." In other words, defense counsel was attacking the witness' credibility. The State was therefore entitled to rehabilitate Woodall's credibility. We think it bolstered Woodall's credibility when she admitted to testifying against defendant in spite of his alleged threats against her and her family. Accordingly, the question was appropriate and, contrary to defendant's contentions in his brief, rel-

evant. "[T]he scope of redirect examination is within the sound discretion of the trial court, which will not be reversed absent an abuse of that discretion." *State v. Barnard,* 899 S.W.2d 617, 624 (Tenn.Crim.App.1994). No such abuse is apparent here, and this issue is therefore without merit.

### [DELETED: IX. USE OF DEFEN-DANT'S PRIOR CONVIC-TIONS DURING

### PENALTY PHASE]

### X. USE OF SUBSEQUENT CRIME AS AGGRAVATOR

Defendant next contends that the use of his prior conviction for the Bush carjacking as an aggravating circumstance is unconstitutional. He argues that, because the offense occurred after the instant crimes, its use as an aggravator constitutes due process and *ex post facto* violations. We respectfully disagree.

Our Supreme Court has recently reiterated its oft-repeated holding that, "so long as a defendant is *convicted* of a violent felony *prior* to the sentencing hearing at which the previous conviction is introduced, this aggravating circumstance is applicable." *State v. Hodges,* 944 S.W.2d 346, 357 (Tenn.1997) (emphasis in original). In *State v. Nichols,* 877 S.W.2d at 736, the Court specifically rejected the defendant's contention of a due process violation, even

where the prosecutor admitted that the defendant's multiple trials had been ordered in such a way as to create an additional aggravating circumstance. And in *State v. Caldwell,* 671 S.W.2d 459, 465 (Tenn.1984), the Court specifically rejected the argument that a prior conviction based on a subsequent crime permitted an *ex post facto* law. This issue is therefore without merit.[6]

### [DELETED: XI. EXCLUSION OF EVIDENCE]

### [DELETED: XII. ADMISSION OF FACTS UNDERLYING PRIOR CONVICTION]

### XIII. CONSTITUTIONALITY OF TENNESSEE'S DEATH PENALTY STATUTES

Defendant argues that the Tennessee death penalty statutes are unconstitutional under both the United States and Tennessee constitutions.[7] Specifically, he argues that our statutes fail to meaningfully narrow the class of death eligible defendants; that the death sentence is imposed capriciously and arbitrarily; that electrocution is cruel and unusual punishment; and that the appellate review process in death penalty cases is constitutionally inadequate. Our Supreme Court has previously rejected these arguments, and so, therefore, must we. *See, e.g., State v. Nesbit,* 978 S.W.2d 872 (Tenn.1998), *cert. denied,* 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520

---

6. We are puzzled by defendant's assertion in his brief that, "[a]t the time of [Hunter's] murder, the notice that [he] had was clear: he only faced life imprisonment." Besides finding that defendant had been convicted of a prior violent felony, the jury found two additional aggravating circumstances: that defendant committed the murder to prevent his arrest and/or prosecution, and that he committed or aided the murder while he had a substantial role in committing the robbery or kidnapping. Both of these aggravators arose

simultaneously with the murder, and defendant therefore "had notice" when he pulled the trigger that he faced the death penalty.

7. Defendant refers to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and to Article I, Sections Eight, Nine, Sixteen and Seventeen, and Article II, Section Two of the Tennessee Constitution.

(1999), *affirming State v. Clarence C. Nesbit,* C.C.A. No. 02C01 9510 CR 00293, reported at 978 S.W.2d 897; and *State v. Cribbs,* 967 S.W.2d 773 (Tenn.1998), *cert. denied,* 525 U.S. 932, 119 S.Ct. 343, 142 L.Ed.2d 283 (1998), *affirming State v. Perry A. Cribbs,* C.C.A. No. 02C01 9508 CR 00211, reported at 967 S.W.2d 792. This issue is without merit.

## XIV. CUMULATIVE ERROR AND WAIVER OF ERROR

Defendant contends that the cumulative effect of errors committed during the penalty phase of his trial require a reversal of his death sentence and a new sentencing hearing. We respectfully disagree. We have carefully reviewed the record and considered the errors assigned by defendant, and have determined that none of them, either individually or cumulatively, constitute prejudicial error requiring reversal. This issue is without merit.[8]

## [DELETED: XV. STATUTORY REVIEW OF SENTENCE]

## [DELETED: XVI. APPLICABILITY OF FELONY MURDER AGGRAVATOR]

Defendant's convictions and sentences are affirmed.

CONCUR:

NORMA McGEE OGLE, Judge

ALAN E. GLENN, Judge

ADOLPHO A. BIRCH, Jr., J., concurring and dissenting.

Although I agree with the majority's decision to uphold the conviction in this case, I write separately to emphasize my continued dissatisfaction with Tennessee's comparative proportionality review protocol. Beginning with my dissent in *State v. Chalmers,* I have repeatedly called for reform of the protocol. 28 S.W.3d 913, 923–25 (Tenn.2000) (Birch, J., concurring and dissenting); *see also, e.g., State v. Carruthers,* 35 S.W.3d 516, 581 (Tenn.2000) (Birch, J., concurring and dissenting); *State v. Keen,* 31 S.W.3d 196, 234 (Tenn.2000) (Birch, J., concurring and dissenting). Our current protocol, in my view, has three shortcomings: "the 'test' we employ [for comparative proportionality review] is so broad that nearly any sentence could be found proportionate; our review procedures are too subjective; and the 'pool' of cases which are reviewed for proportionality is too small." *Chalmers,* 28 S.W.3d at 923 (Birch, J., concurring and dissenting). Unless these shortcomings are remedied, this Court cannot provide genuine assurance that disproportionate sentences of death will be set aside.

"I am unwilling to approve of results reached through the use of a procedure with which I cannot agree," [1] and to date, the flaws I perceive in our comparative proportionality review protocol have not been cured. Therefore, I dissent, respectfully, from the Court's decision to impose the death penalty in this case.

---

8. Defendant also contends that, while the State argues that he has waived certain issues, the usual waiver rules should not apply to issues which relate to the reliability of the death sentence. Since we have addressed all of defendant's assignments of error on the merits, we deem it unnecessary to address this contention.

1. *See Coe v. State,* 17 S.W.3d 193, 248–49 (Tenn.2000) (Birch, J., dissenting).