IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 29, 2008 Session

## STATE OF TENNESSEE v. MUSTAPHA BOUTCHICHE

**Direct Appeal from the Criminal Court for Knox County**
**No. 80258     Richard R. Baumgartner, Judge**

---

**No. E2007-00473-CCA-R3-CD- Filed January 12, 2009**

---

The defendant, Mustapha Boutchiche, was convicted of sexual battery, a Class E felony, and sentenced as a Range I, standard offender to two years in the Department of Correction. On appeal, he argues that the trial court erred in excluding evidence that the victim was untruthful in a prior proceeding, admitting the victim's 9-1-1 phone call, not requiring the State to make an election of offenses, and ordering that he undergo a psychosexual evaluation prior to sentencing. He also argues that his sentence was excessive because the trial court enhanced his sentence based on enhancement factors not proven to a jury beyond a reasonable doubt and denied probation because he refused to undergo the psychosexual evaluation. We affirm the defendant's conviction and the trial court's denial of probation but modify his sentence to one year.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Mark E. Stephens, District Public Defender, and John Halstead, Assistant Public Defender, for the appellant, Mustapha Boutchiche.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phillip H. Morton, Ta Kisha M. Fitzgerald, Willie Harper, Del Holley, and Leland Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

**State's Proof**

The defendant was initially tried in June 2005 for the rape of the victim. The jury could not reach a unanimous verdict, so the defendant was retried in April 2006. At the second trial, the victim, A.S.,[1] testified that shortly after graduating high school in Texas she got a job selling magazines door-to-door. In March 2003, she traveled with her manager and some other saleswomen to Tennessee. Sometime after 5:00 p.m. on March 19, 2003, she went to the Woodview Terrace Apartments in Knoxville. She was speaking with a man on a balcony when the defendant pulled up in a green truck and asked to speak to her. She explained that she was selling magazines, and the defendant said he would like to hear more. She got into the defendant's truck, and they drove to a Chick-Fil-A restaurant where the defendant purchased food for her. The victim tried to convince the defendant to purchase some magazines. She said he agreed to purchase three magazines, and she began to fill out her receipt book. She attempted to discuss payment, but the defendant told her to wait until they returned to his apartment.

When they arrived back at the apartment complex, the defendant invited the victim inside for tea. The victim again attempted to discuss payment of the magazines, and the defendant told her that he did not have any money with him. As she began to suggest various methods of payment, the defendant moved closer to her, kissed her, pulled up her dress, and sucked on her breast. She pushed him away, and he offered her $200 in exchange for oral sex. She refused, telling him, "I'm not a prostitute. I'm just here trying to sell you magazines." He increased the price to $500, and she agreed "at first." She began to perform oral sex on him, but quickly stopped because she could not go through with it. She attempted to leave, but the defendant held her down and wedged her into the corner of a couch. He pulled down her leggings, held her legs above her head, and penetrated her vagina. After a short time, he stopped. The victim got up, told the defendant, "You just raped me," and threatened to call the police. The defendant told her to wait while he retrieved money from his bedroom. He returned wearing a condom and asked the victim to continue to have sex with him. She refused and screamed at him, and he told her to leave the apartment.

The victim ran to the front entrance of the parking lot where she was to be picked up by her manager. He arrived ten to fifteen minutes later, and the victim told him what had happened. He told her to go to a nearby grocery store and call a more senior manager. After speaking with the senior manager, she called 9-1-1 and was subsequently transported by ambulance to a hospital where DNA samples were collected and a physical examination was performed. The victim acknowledged that she told a nurse and a detective that the oral sex was nonconsensual but said she did so because she was scared, ashamed, and disgusted with herself. She stated that the first time she told anyone that the oral sex was consensual was the day before the trial. She said she was now telling the truth "[b]ecause I want him to pay."

On cross-examination, the victim acknowledged that she testified in the first trial that the defendant forced her to perform oral sex. She said she agreed initially to perform the oral sex for money because she was scared to return to her employers without money for the magazine subscriptions. She testified that if she filled out a voucher for a magazine subscription and lost the receipt or did not return with the money, her employers would fine her $100. She stated that when

---

[1] It is the policy of this court to refer to victims of sexual abuse by their initials.

she left the defendant's apartment, she told him, "You just raped me. I want that money. If you don't give it to me, I'm going to call the police and tell them what you did to me." She acknowledged that approximately forty-four minutes elapsed between the time she left the defendant's apartment and her 9-1-1 call.

Dr. Qadriyyah Debnam, a Tennessee Bureau of Investigation forensic scientist specializing in serology and DNA analysis, testified that she found a small amount of sperm in a vaginal swab taken from the victim. However, she was only able to obtain the victim's DNA profile from the vaginal swab. She testified that she found saliva in a swab taken from the victim's right breast but could not extract enough DNA to determine its source. She also found saliva in a swab taken from the victim's left breast and discovered a partial DNA profile consistent with a mixture of genetic material from the victim and the defendant. She testified that the probability of obtaining this mixed profile from unrelated individuals is approximately 1 in 242 for the African-American population, 1 in 381 for the Caucasian population, 1 in 248 for the Southeastern Hispanic population, and 1 in 220 for the Southwestern Hispanic population. In response to a juror's question, Dr. Debnam testified that sperm can last in the female body for up to 72 hours.

Betsy Moore, who at the time of the offense worked as a sexual assault nurse examiner, testified that she examined the victim and did not observe any injuries. She testified that this was not unusual in a sexual assault case.

Charles Lee, an investigator with the Knoxville Police Department, testified that he spoke with the victim on March 19, 2003, and that she was visibly upset and crying heavily. He asked her to show him the defendant's apartment and describe his vehicle. When he went to the apartment to speak with the defendant, he discovered that the defendant did not live at the apartment she had indicated. However, after he left the apartment, he saw a vehicle matching the victim's description of the defendant's vehicle enter the parking lot. Investigator Lee spoke with the defendant, who invited him to his apartment to speak further. The defendant told Investigator Lee that the victim came to his apartment selling magazines, he told her he was not interested, and she left. The defendant stated that he later left the apartment complex to run an errand, and the victim flagged him down and asked him to take her to a nearby Weigel's store. The defendant said he took the victim to Weigel's but later admitted that he had also taken her to Chick-Fil-A to eat. While at Chick-Fil-A, the defendant saw the victim filling out the magazine vouchers and provided her a fake name and address because he did not wish to be responsible for purchasing magazines.

The defendant told Investigator Lee that when they returned from Chick-Fil-A, he dropped the victim off at Weigel's and returned to his apartment. The defendant said that, a short time later, the victim knocked on his door demanding that he pay for the vouchers she had filled out. He told the victim he did not want the magazines, she became upset, he slammed the door, and she left. Investigator Lee asked the defendant if there had been any sexual contact between him and the victim, and the defendant replied in the negative.

On cross-examination, Investigator Lee testified that the victim told him that the defendant forced her to perform oral sex. He said the defendant told him that the victim threatened to call the police if he did not pay for the magazines.

**Defense Proof**

The defendant testified that he was asleep on March 19, 2003, when the victim knocked on his door. She told him she was selling magazines, and he said he was not interested and went back to sleep. He later left his apartment to run an errand and saw the victim standing in the parking lot. She waved to him, he stopped, and she asked if he would give her a ride to Weigel's. He agreed, and she got into his truck and began telling him about the magazines. She told him that she was hungry and had no money, so he offered to buy her some food. The defendant testified that he again told her that he was not interested in purchasing magazines.

The defendant and the victim went to Chick-Fil-A where the defendant purchased food. As they sat to eat, the victim asked the defendant his name and began filling out magazine vouchers. He again told her that he was not interesting in buying any magazines. When she persisted in asking him to buy magazines, the defendant decided to give her a false name and address so she would leave him alone. He acknowledged that he signed the vouchers. He said he asked about the price, but the victim would not disclose it, saying she would "take care" of the price for him. On the way home, the victim told the defendant that the magazines would cost $92. He told her he could not afford to pay that much money, and she became upset. He eventually asked her to leave his vehicle, and she called him an "asshole."

The defendant returned to his apartment and began to make tea. Fifteen to twenty minutes later, the victim knocked on the door and was crying, begging him to pay for the magazines. He invited her inside to calm down. Again, she asked him to pay for the magazines and he refused. The defendant testified that the victim then offered him sex in exchange for money, and he refused. The victim then said, "If you don't give me the money, I'm going to call the police." The defendant responded, "Go ahead. Call the police and leave my apartment," and the victim left. On cross-examination, the defendant acknowledged that he had previously lied during the course of a criminal investigation.

Following deliberations, the jury found the defendant guilty of the lesser-included offense of sexual battery. Before sentencing, the defendant was required by Tennessee Code Annotated section 39-13-705 to undergo a psychosexual evaluation. On the advice of counsel, the defendant refused to undergo the evaluation and moved to be excused from participating on the grounds that doing so would violate his right to due process of law and his privilege against self-incrimination. The trial court denied the defendant's motion to be excused but granted permission to seek an interlocutory appeal to this court. See Tenn R. App. P. 9. This court denied the defendant's application for an interlocutory appeal.

At the sentencing hearing, neither the State nor the defendant presented testimony. The State introduced into evidence the presentence report, which reflected that the defendant had no prior criminal convictions. The State also introduced a portion of a witness's testimony from a separate trial in which the defendant was acquitted of aggravated rape.

After hearing the arguments of counsel, the trial court sentenced the defendant to two years, stating:

> I remember the facts from the [aggravated rape case in which the defendant was found not guilty]. And, you know, the jury listened to that case and while they did not feel there was sufficient proof to find him guilty beyond a reasonable doubt in that case, and acquitted him and found him not guilty, I think clearly the evidence in that case indicated that there was some conduct that was inappropriate on [the defendant's] behalf. It may not have risen to the level of being a rape charge. In fact, the jury found that it was not – that there was not sufficient evidence to convict him beyond a reasonable doubt. But I think there was evidence of inappropriate conduct in that case. So I think I can consider that. I'm not going to give it a great deal of weight.
>
> Also, in this particular case, . . . this was a young lady who was out selling magazines and, you know, the circumstances under which she was working were deplorable at best, but she was desperate on this particular occasion to make a sale, and I think [the defendant] took advantage of that. Took advantage of her situation. And indeed did assault her. And I think the evidence supports that. I think this jury again was not convinced – I think it was a compromised verdict as is appropriate in certain circumstances. But I think, again, the conduct was such that it indicated an assault on a very young woman by an individual who was in a position because of her circumstances to take advantage of that.
>
> So I think although there's no magic formula, this is only a one to two year range of punishment. I think an appropriate sentence is two years to serve as a range one offender.

The trial court ordered that the defendant serve his sentence in the Department of Correction, holding that because the defendant refused to complete the required psychosexual evaluation, the court had no basis on which to grant probation or alternative sentencing.

## ANALYSIS

On appeal, the defendant asserts that the trial court erred by refusing to permit him to impeach the victim with evidence that she lied about her sexual orientation in the first trial in this case and by permitting the State to play a recording of the victim's 9-1-1 call to the jury. He also argues that the court erred in not requiring the State to elect which instance of sexual contact it wished to prosecute, applying sentencing enhancement factors not found beyond a reasonable doubt by a jury, and denying him probation on the basis of his refusal to submit to the psychosexual evaluation. The State concedes that the trial court improperly applied the enhancement factors but argues that the judgment of the trial court should be affirmed in all other respects. As we will explain, we agree with the State.

### I. Evidentiary Rulings

-5-

## A. Exclusion of Evidence Regarding Victim's Sexual Orientation

The defendant argues that the trial court erred in denying his motion for permission to question the victim regarding her testimony at the first trial that she told the defendant she was a lesbian. He asserts that at the hearing on his motion, the victim contradicted this testimony by admitting that she had sexual intercourse with a man two weeks before her encounter with the defendant and that the testimony was therefore admissible under Tennessee Rule of Evidence 412 as proof of a specific instance of a victim's sexual behavior offered by the accused on the issue of credibility of the victim. He also argues that the evidence was admissible under Tennessee Rule of Evidence 608(b) as a specific instance of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, and under Tennessee Rule of Evidence 616 to show the victim's bias against him.

Pursuant to Rule 412, the defendant filed a pretrial motion for permission to cross-examine the victim about her testimony at the first trial that she was a lesbian. In the hearing on that motion, the victim acknowledged having testified at the first trial that she told the defendant she was a lesbian. She further acknowledged that she had engaged in sexual intercourse with a man approximately two weeks prior to her encounter with the defendant. When asked how she reconciled that fact with her testimony that she was a lesbian, the victim replied that she considered herself a lesbian regardless of having had sexual intercourse with a man, adding that she knew "lots of lesbians that have slept with men."

When asked by the trial court to clarify whether she was testifying that she was bisexual rather than homosexual, the victim replied:

> Well, I suppose if that's what it means, then yes, I guess I'm bisexual but – I mean, I really don't know what to say to that. I mean, I didn't lie about it. So, I mean, if that's what I said [that she was a lesbian], then that's what I said, and that's what I meant. But I didn't think that it was relevant for [the defendant] to know that [the fact that she also had had sexual intercourse with a man].

After reviewing the victim's testimony at the first trial, the trial court denied the defendant's motion, stating:

> I don't think that that testimony indicates that she was lying about her sexual orientation. She's just saying, "I told him I was a lesbian," and she was a lesbian, and she did it so that he wouldn't get the idea she was there for some purpose other than to sell him magazines. So I don't think that that's . . . a misrepresentation of her sexual orientation. I mean, she was a lesbian, even if she had – on prior occasions had sexual relationships with a man.

Tennessee Rule of Evidence 412 generally excludes evidence of specific instances of a sexual assault victim's sexual behavior. One exception to the general prohibition is when such evidence is offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim

has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim. The rule provides in pertinent part:

> (c) Specific instances of conduct. – Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures of subdivision (d) of this rule, and the evidence is:
>
> (1) Required by the Tennessee or United States Constitution, or
>
> (2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or
>
> (3) If the sexual behavior was with the accused, on the issue of consent, or
>
> (4) If the sexual behavior was with persons other than the accused,
>
>> (i)  to rebut or explain scientific or medical evidence, or
>>
>> (ii)  to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
>>
>> (iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c). However, even if the court determines that the evidence satisfies one of these conditions, it must still determine that its probative value outweighs its unfair prejudice to the victim. Tenn. R. Evid. 412(d)(4). Rule 412 is a rule of general exclusion, intended to "strike[] a balance between the paramount interests of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy." Tenn. R. Evid. 412, Advisory Commission Cmts. (1991).

We conclude that the trial court properly held that the proffered testimony was inadmissible. Tennessee Rule of Evidence 412 permits a defendant to introduce specific instances of a victim's sexual behavior only if the prosecutor or victim presents evidence during the trial regarding the victim's sexual behavior. In the first trial, the State referred in closing argument to the victim's testimony that she was a lesbian to argue that the defendant had to be the source of the semen found in the victim. In the second trial, however, the victim did not testify about her sexual orientation and

the prosecutor made no reference to it. The evidence was not, therefore, admissible under Rule 412 on the credibility of the victim. Furthermore, given the DNA expert's testimony that sperm can last in the female body for only up to 72 hours, evidence that the victim had sexual intercourse with a man some two weeks prior to the incident was not admissible under Rule 412 to rebut scientific or medical evidence offered by the State. Thus, the general prohibition against evidence of specific instances of a victim's sexual behavior remained in place.

Also, the evidence was inadmissible to impeach the victim's credibility under Tennessee Rule of Evidence 608. Tennessee Rule of Evidence 608(b) provides, in pertinent part, that specific instances of conduct by a witness for the purpose of attacking or supporting the witness's character for truthfulness may be inquired into on cross-examination provided that:

> (1) The trial court holds a hearing outside the jury's presence and determines that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; and
>
> (2) The conduct occurred no more than ten years before the commencement of the action or prosecution.

The defendant contends that the probative value of evidence that the victim had voluntary sexual intercourse with a man two weeks prior to her encounter with the defendant "is extremely high in that it proved [the victim] lied under oath in the first trial against [the defendant]." We respectfully disagree with the defendant's characterization of the victim's testimony as a lie. At the hearing on the Rule 412 motion, the victim made it clear that she thought of and defined herself as a lesbian at the time of her encounter with the defendant:

> [Defense Counsel]: I take it you testified, recalling, at the prior hearing in this -- prior trial in this matter, June 25th, 2005?
>
> [The Victim]: Yes, sir.
>
> [Defense Counsel]: Do you recall . . . being asked about whether or not you had talked to [the defendant] about relationships or anything such as that, sex or anything? Do you recall [counsel for the State] asking you that question?
>
> [The Victim]: Up until recently I didn't.
>
> [Defense Counsel]: Okay.
>
> [The Victim]: I do now, though.
>
> [Defense Counsel]: Okay. And your answer was, "Yeah. I told him I was a lesbian." Do you recall that?
>
> [The Victim]: I do now, yes.

-8-

[Defense Counsel]: And [counsel for the State] asked why you told him you were a lesbian, and do you recall answering, "Because I was, and you know, I guess I was letting him know ahead of time that I was just there to sell magazine subscriptions to him and that's all."

[The Victim]: Okay.

[Defense Counsel]: Do you recall that answer?

[The Victim]: Yes, sir.

[Defense Counsel]: So you were testifying that at the time of the events in this case you were a lesbian?

[The Victim]: Yes, sir.

[Defense Counsel]: Okay. Isn't it a fact that that's not true, that at the time of this case . . . you were not a lesbian. You were bisexual?

[The Victim]: If that's what I said, then that's what I said. But at the time I felt that I was, and I felt that he didn't need to know that I was interested in men.

[Defense Counsel]: Now, did you tell the state that you had last had sex with a man about two weeks before this encounter with [the defendant]?

[The Victim]: Yes, sir.

. . . .

[Defense Counsel]: How do you . . . define a lesbian as someone who -- simply who just prefers women, period?

[The Victim]: Sure. I don't know how to explain that. I mean, at the time that's what I said. That's all I felt was important for him to know. Sure, if I had sexual relations with a man two weeks prior to that, I didn't think that he needed to know that.

[Defense Counsel]: Okay. And I'm not disagreeing with that point.

[The Victim]: And I didn't even remember that incident up until recently.

[Defense Counsel]: But . . . you would agree that whether he needed to know anything or not on March 19th, 2003, you were not solely a lesbian?

[The Victim]: At the time I felt I was . . . regardless whether I slept with a man or not. I mean, I know lots of lesbians that have slept with men.

The record simply does not support the defendant's claim that the victim lied about her sexual orientation during the first trial.

Finally, the evidence was also inadmissible under Rule 616. Rule 616 of the Tennessee Rules of Evidence provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." The defendant contends that "[t]he fact [the victim] lied while under oath in the first trial . . . is certainly evidence of bias against" him and argues that he was therefore denied his constitutional right to confront a witness and to present his defense by the exclusion of the evidence.

The cases the defendant cites in support of this argument, however, are readily distinguishable from the case at bar. In Olden v. Kentucky, 488 U.S. 227, 109 S. Ct. 480 (1988), the defendant, an African-American male who was tried for the kidnapping, rape, and sodomy of a Caucasian female, sought to show that the victim had consented to the sexual encounter but later "concocted the rape story to protect her relationship with [her African-American boyfriend], who would have grown suspicious upon seeing her disembark" from the defendant's vehicle. Id. at 229-30, 109 S. Ct. at 481-82. Prevented at trial from introducing proof of the victim's current cohabitation with that boyfriend, the defendant appealed, arguing that his Sixth Amendment right to confront witnesses was violated by the trial court's refusal to allow him to introduce evidence that would have shown the victim had a motive to lie. Id. at 230, 109 S. Ct. at 482. The Kentucky Court of Appeals upheld the trial court's ruling on the basis that, while the evidence was relevant, its probative value was outweighed by the prejudicial effect that knowledge of the victim's interracial living arrangement may have had on the jury. Id. at 230-31, 109 S. Ct. at 482. The United States Supreme Court reversed, concluding that "[s]peculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the victim's] testimony." Id. at 232, 109 S. Ct. at 483. Unlike in the case at bar, there was no question but that the evidence was relevant to show the victim's prejudice against the defendant. Id.

The excluded evidence in State v. Brown, 29 S.W.3d 427, 434 (Tenn. 2000), was also unquestionably relevant to the defense. In that case, the defendant appealed the trial court's denial of his Rule 412 motion to present hearsay evidence of the minor victim's prior sexual behavior with another male "to provide the jury with an alternative explanation" for the tear in the victim's hymen. Id. at 429. The court first observed that the evidence was "clearly relevant to rebut the State's medical proof . . . and met the threshold admissibility standard of Tennessee Rule of Evidence 412." Id. at 434. The court then concluded that, despite the rule against hearsay, the evidence should have been admitted "to satisfy [the defendant's] constitutional right to present a defense." Id. at 436.

The proffered evidence in the present appeal, by contrast, was not relevant to any issue at trial and failed to meet any of the criteria for admissibility under Rule 412. We conclude, therefore, that the trial court properly excluded the evidence as irrelevant and inadmissible.

## B. Admission of 9-1-1 Recording

The defendant argues that the trial court erred in admitting a tape recording of the victim's 9-1-1 call. He claims that the tape was inadmissible as an excited utterance because the victim was not under the stress of the startling event when she made the call. He further contends that, even if admissible as an excited utterance, the tape should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. The State responds that the tape properly was admitted as an excited utterance, and the trial court did not abuse its discretion in finding that the risk of unfair prejudice did not substantially outweigh the probative value.

On the portion of the recording played for the jury, the victim tells the 9-1-1 operator that she wants to report a rape. She says she is at a convenience store and the defendant is at his apartment next door. She states that she does not need an ambulance and just wants the defendant to go to jail. She describes her appearance to the operator. The operator asks if the defendant attempted to rape her or actually raped her, and the victim replies that he actually raped her. The operator asks for the defendant's name and address, and the victim states that his name is "Malik Celhajb" and that he lives at 598 Woodview Lane. The victim informs the operator that the rape occurred around 7:25 p.m. The victim's voice is trembling, and she is crying throughout the entire recording.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Generally, relevant evidence is admissible and irrelevant evidence is inadmissible. Tenn. R. Evid. 402. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn R. Evid. 403.

Hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible. See Tenn. R. Evid. 801-802. However, excited utterances, statements relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition, are not excluded by the hearsay rule. Id. R. 803(2). There is a twofold rationale for admitting excited utterances:

> First, since this exception applies to statements where it is likely there was a lack of reflection--and potential fabrication--by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it.

State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001) (citations omitted), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572 (Tenn. 2004).

The first requirement, that there be a startling event or condition, is broadly construed, encompassing any event "sufficiently startling to suspend the normal, reflective thought processes of the declarant." Stout, 46 S.W.3d at 699 (citations omitted). The second requirement, that the statement relate to the startling event or condition, is satisfied if the statement describes all or part of the event or condition, or deals with the effect or impact of that event or condition. Id.

"The third requirement, that the statement be made while the declarant is under the stress or excitement from the event or condition, relates most directly to the underlying rationale for the exception." Stout, 46 S.W.3d at 699-700. In State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993), the supreme court said that "[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication." The time interval between the startling event and the declarant's statement is only one consideration in determining whether this third requirement is satisfied and is not dispositive. "Other relevant circumstances include the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself, which may indicate the presence or absence of stress." Id. at 700 (citations omitted).

We first consider whether the statement on the recording was properly admitted as an excited utterance. The defendant concedes that the sexual battery was a startling event and that the victim's statement related to it, but he argues that the victim was not under the stress of excitement caused by the startling event because approximately forty-four minutes elapsed between the sexual assault and her 9-1-1 call. However, as we have set out, the time interval between the startling event and the statement is but one factor in our analysis. The declarant was an eighteen-year-old woman who had recently experienced a sexual assault. Throughout the recording, she cried and experienced difficulty in speaking with the operator, which indicated that she was under great stress when making the statement. The defendant has not shown that the trial court abused its discretion in admitting the statement as an excited utterance.

The defendant further argues that even if the statement were admissible as an excited utterance, the trial court should have excluded it because, in his view, its probative value was substantially outweighed by the danger of unfair prejudice. He argues that "[t]he only possible probative information" on the recording is that the defendant gave a false name to the victim and that the recording is highly prejudicial because the victim was extremely upset and the 9-1-1 operator displayed sympathy toward her.

However, the State responds, and we agree, that the recording is probative because it allowed jurors to evaluate the victim's demeanor after the sexual battery and to judge her credibility. See State v. Matthew Douglas Cox, No. E1999-00351-CCA-R3-CD, 2000 WL 1562920, at *15 (Tenn. Crim. App. Oct. 20, 2000), perm. to appeal denied (Tenn. Apr. 9, 2001). There were no witnesses to the encounter between the defendant and the victim. Therefore, the issue of the victim's

credibility was important. The trial court was in the best position to balance the probity and prejudice of the recording, and the record supports its decision.

## II. Election of Offenses

The defendant argues that the trial court erred by not requiring the State to elect the specific touching required for the sexual battery conviction. He contends that "[t]his Court in its appellate review cannot be certain that some or all of the jurors did not in fact base their verdict on [the defendant's] alleged sucking of [the victim's] breast, or her voluntarily performing oral sex on him." He argues that because these two instances of sexual conduct were consensual, the State was required to elect that it was seeking a conviction on the vaginal penetration. The State argues that an election was not required because there was proof of only one offense and the indictment was specific as to the offense for which the defendant was being charged. We agree with the State.

The Tennessee Constitution safeguards the right of a criminal defendant to a unanimous jury verdict before a conviction may be imposed. State v. Lemacks, 996 S.W.2d 166, 169-70 (Tenn. 1999). Where the State presents evidence showing that more than one offense occurred, but the indictment is not specific for which offense the defendant is being tried, it is the responsibility of the trial court to require the State to elect which offense is being submitted to the jury. Id. at 170; see also State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991) ("[I]n cases involving evidence which shows a real potential that a conviction may occur as a result of different jurors concluding that the defendant committed different acts, each of which separately showing the commission of an offense, the trial court must augment the general unanimity instruction to insure that the jury understands its duty to agree unanimously to a particular set of facts.").

In State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999), our supreme court explained the purpose for requiring an election of offenses:

> The requirement of election serves numerous interests: it enables the defendant to prepare for the specific charge; it protects a defendant against double jeopardy; it enables the trial judge to review the weight of the evidence in its role as thirteenth juror; and it enables an appellate court to review the legal sufficiency of the evidence. See Tidwell [v. State], 922 S.W.2d [497,] 500-01 [(Tenn. 1996)]; Burlison [v. State], 501 S.W.2d [801,] 803 [(Tenn. 1973)]. The most important interest served by election, however, is to ensure that the jurors deliberate over and render a verdict based on the same offense[.]

The defendant was originally charged with the aggravated rape of the victim. On June 29, 2005, an agreed order was entered amending the charge to rape. The indictment, as amended, reads as follows:

> THE GRAND JURORS for the State of Tennessee, upon their oaths, present that MUSTAPHA BOUTCHICHE, ALIAS, heretofore to-wit: on or about the 19th day of March, 2003, did, unlawfully and knowingly sexually penetrate [the victim],

without the consent of [the victim], and at the time of penetration the said MUSTAPHA BOUTCHICHE knew or had reason to know that [the victim] did not consent to said penetration, in violation of T.C.A. 39-13-503, and against the peace and dignity of the State of Tennessee.

The trial court instructed the jury on the elements of the offense as well as on the relevant elements of the lesser-included offenses of aggravated sexual battery, sexual battery, and assault. After deliberating, the jury convicted the defendant of the lesser-included offense of sexual battery, which is defined in pertinent part as "unlawful sexual contact with a victim by the defendant . . . accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent." Tenn. Code Ann. § 39-13-505(a)(2).

The defendant argues that some jurors may have based the conviction of sexual battery on evidence that the victim performed oral sex on him or that he sucked on her breast, rather than on the evidence relating to the sexual penetration, thereby denying him of his constitutional right to a unanimous verdict. However, neither the evidence concerning oral sex nor the evidence concerning the defendant's sucking of the victim's breast would be sufficient for the jury to find that the defendant committed a sexual battery of the victim. As the State points out, the victim admitted in her testimony that the oral sex was consensual, and there was no proof that the defendant's touching of the victim's breast was without consent or, if it was, that the defendant knew at the time that it was without consent.

### III. Application of Enhancement Factors

The defendant argues that the trial court erred in sentencing him to two years, the maximum sentence for a Class E felony, on the basis of two enhancement factors which were not proven to the jury beyond a reasonable doubt. The State concedes that the enhancement factors were applied improperly and that the defendant should have been sentenced to the minimum one year. We agree with the parties and reduce the defendant's sentence from two years to one year.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). However, the presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

Because, as we will explain, we conclude that the trial court erred in application of certain of the enhancement factors, our review is *de novo*, without a presumption of correctness. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001) (citing Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986)). The appealing party bears the burden of showing the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

The defendant committed the offense in 2003 and was sentenced according to the pre-2005 version of the Tennessee Criminal Sentencing Reform Act. The pre-2005 Sentencing Act permitted a trial court to increase a defendant's sentence if it found certain enhancement factors by a preponderance of the evidence. See Tenn. Code Ann. §§ 40-35-114, -210 (2003) (repealed); State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998). However, the United States Supreme Court has held that any fact other than that of a prior conviction used to enhance a defendant's sentence must be proven to a jury beyond a reasonable doubt. Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 2536 (2004). Subsequently, the Tennessee Supreme Court held that Tennessee's pre-2005 Sentencing Act ran afoul of Blakely to the extent that it permitted trial courts to enhance a defendant's sentence based on judicially-found facts, other than the defendant's prior convictions. State v. Gomez, 239 S.W.3d 733, 740 (Tenn. 2007).

The trial court found as enhancement factors that the defendant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the appropriate range and that the defendant abused a position of private trust. See Tenn. Code Ann. § 40-35-114(2), (16) (2003). The trial court applied the prior criminal history factor not based upon any prior criminal convictions, but upon an aggravated rape charge for which the defendant was acquitted. We recognize that the Tennessee Supreme Court has held that "a sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence." State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000) (footnote omitted). However, Winfield was decided four years prior to Blakely. In light of Blakely's unambiguous holding that *any fact* other than a prior conviction used to enhance a defendant's sentence must be proven to a jury beyond a reasonable doubt, we decline to follow Winfield. Because the facts underlying the defendant's aggravated rape charge were not proven to a jury beyond a reasonable doubt, it was error for the trial court to consider them in determining the defendant's sentence.

Nor was the fact of the defendant's abuse of a position of trust proven to a jury beyond a reasonable doubt. Thus, there are no mitigating or enhancement factors in the record before us. In the absence of enhancement or mitigating factors, the presumptive sentence for a Range I offender

convicted of sexual battery, a Class E felony, is the minimum sentence of one year. Tenn. Code Ann. § 40-35-210(c) (2003). Therefore, we modify the defendant's sentence to one year.

## IV. Tennessee Code Annotated section 39-13-705 Evaluation

The defendant argues that the psychosexual evaluation required by Tennessee Code Annotated section 39-13-705 of convicted sexual offenders is designed to elicit incriminating information and that the requirement to undergo such an evaluation before sentencing violated his Fifth Amendment privilege against self-incrimination. He further contends that the trial court's denial of probation on the basis of his refusal to complete the evaluation impermissibly penalized the invocation of his privilege against self-incrimination. Citing United States v. Kennedy, 499 F.3d 547, 551-52 (6th Cir. 2007), and Dzul v. State, 56 P.3d 875, 880-81 (Nev. 2002), the State notes that other jurisdictions have concluded that a defendant's Fifth Amendment right against self-incrimination is not violated by a psychosexual evaluation requirement and that the trial court may properly consider the defendant's refusal to undergo such an evaluation when setting a sentence. The State additionally notes that this court concluded in State v. Souder, 105 S.W.3d 602 (Tenn. Crim. App. 2002), that a trial court may properly consider a defendant's refusal to answer questions about a crime as a factor in its determination of whether he has met his burden of demonstrating his suitability for probation. The State, contends, therefore, that the trial court properly ordered the defendant to undergo the psychosexual evaluation and denied him probation following his refusal to submit to the evaluation. As we will explain, we agree with the State.

Tennessee Code Annotated section 39-13-705(a) provides that sex offenders seeking probation or alternative sentencing must submit to an evaluation:

> On and after January 1, 1996, each sex offender who is to be considered for probation or any other alternative sentencing shall be required to submit to an evaluation for treatment, risk potential, procedures required for monitoring of behavior to protect victims and potential victims, and an identification under the procedures developed pursuant to § 39-13-704(d)(1).

Tennessee Code Annotated section 39-13-704(d)(1) sets out the duties of the sex offender treatment board:

> The [sex offender treatment] board shall develop and prescribe a standardized procedure for the evaluation and identification of sex offenders. The procedure shall provide for an evaluation and identification of the offender and recommend behavior management monitoring and treatment based upon the knowledge that sex offenders are extremely habituated and that there is no known cure for the propensity to commit sex abuse. The board shall develop and implement measures of success based upon a no-cure policy for intervention. The board shall develop and implement methods of intervention for sex offenders that have as a priority the physical and psychological safety of victims and potential victims and that are appropriate to the needs of the

particular offender; provided, that there is no reduction of the safety of victims and potential victims.

After his conviction, the defendant filed a pleading styled "Motion to Prohibit the Requirements of Tenn. Code Ann. § 39-13-701 through § 39-13-709 From Being Applied to [the Defendant] Before Sentencing and Before Completion of His Appeals." The trial court conducted a hearing on the motion on June 1, 2006. At this hearing, the defendant presented no proof regarding the format of the psychosexual evaluation. At a further proceeding in the case, the trial court denied the defendant's motion, concluding that because the evaluation requirement is mandatory, the court had no discretion to waive it. The trial court granted the defendant permission to seek an interlocutory appeal, but this court denied permission to appeal.

The defendant did not undergo the psychosexual examination before sentencing, and the trial court ordered that he serve his sentence in confinement.

We begin our analysis of this issue by observing that at the hearing on his motion, the defendant presented no proof regarding the content of the psychosexual evaluation. Thus, although he asserts that "[t]he Psycho Sexual Examination required under Tenn. Code Ann. 39-13-705 generally requires an offender to talk completely about the offense for which they have been convicted; talk about their complete prior sexual history; talk about their attitudes and feelings towards persons who could potentially be victims; and other incriminating areas[,]" he does not support this general statement with any specific allegation that *his* psychosexual evaluation would have required him to answer self-incriminating questions. Therefore, even if we were to decide that a psychosexual evaluation that requires a defendant to reveal incriminating information infringes upon his Fifth Amendment rights, we would be unable to conclude that the psychosexual evaluation in this particular case infringed upon the defendant's Fifth Amendment privilege against self-incrimination.

Moreover, we agree with the State that the holding in Mitchell v. United States, 526 U.S. 314, 119 S. Ct. 1307 (1999), cited by the defendant in support of his argument, did not preclude the trial court from considering the defendant's refusal to undergo the psychosexual evaluation when determining whether he was a suitable candidate for probation. In Mitchell, the United States Supreme Court held that a defendant's guilty plea does not result in the waiver of the Fifth Amendment privilege against self-incrimination at sentencing and that the trial court may not draw negative inferences from a defendant's invocation of that right when determining facts and circumstances about the crime that bear upon the severity of the sentence. Id. at 317, 119 S. Ct. at 1309. The Court made it clear that its holding was to be narrowly applied, writing:

> The rule against adverse inferences is a vital instrument for teaching that the question in a criminal case is not whether the defendant committed the acts of which he is accused. The question is whether the Government has carried its burden to prove its allegations while respecting the defendant's individual rights. The Government retains the burden of proving facts relevant to the crime at the sentencing phase and cannot enlist the defendant in this process at the expense of the self-incrimination

privilege. *Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1998), is a separate question. It is not before us, and we express no view on it.*

Id. at 330, 119 S. Ct. at 1316 (emphasis added).

The Sixth Circuit Court of Appeals relied upon the narrowness of that holding when rejecting a defendant's claim that a trial court had violated his Fifth Amendment privilege against self-incrimination by drawing a negative inference from his refusal to complete a psychosexual evaluation. The defendant in Kennedy pled guilty to distributing child pornography and was sentenced by the district court to 87 months imprisonment, followed by a lifetime of supervised release. Kennedy, 499 F.3d at 551. On appeal, he argued that the district court abused its discretion and violated his Fifth Amendment rights by considering his unwillingness to complete the psychosexual examination when setting his sentence. The Sixth Circuit concluded that Mitchell did not prohibit the district court from considering the defendant's refusal to complete the examination in its determination that the 87-month sentence and lifetime of supervised release were necessary to protect the public:

> Given the narrowness of its holding, Mitchell simply does not limit the district court's ability to consider a wide variety of "information concerning the background, character, and conduct" of the defendant in determining an appropriate sentence, 18 U.S.C. § 3661; to "order a study of the defendant," id. § 3552(b); and, therefore, to consider the defendant's refusal to cooperate in assessing what sentence is necessary "to protect the public from further crimes of the defendant," id. § 3553(a)(2)(C). In fact, as Justice Scalia aptly observed, "Few facts available to a sentencing judge . . . are more relevant to 'the likelihood that [a defendant] will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, [and] the degree to which he does or does not deem himself at war with his society' than a defendant's unwillingness to cooperate." Mitchell, 526 U.S. at 339, 119 S. Ct. 1307 (Scalia, J., dissenting) (quoting Roberts v. United States, 445 U.S. 552, 558, 100 S. Ct. 1358, 63 L. Ed. 2d 622 (1980)).

Id. at 552.

The defendant in Dzul, another of the cases relied upon by the State, argued that his Fifth Amendment right against self-incrimination was violated when the trial court denied him probation based on his having maintained his innocence throughout his court-ordered psychosexual evaluation. Dzul, 56 P.3d at 876. In rejecting his claim, the Nevada Supreme Court distinguished between a penalty imposed and a benefit denied:

> [W]e conclude that probation is a form of leniency and that Dzul was not penalized in this case for refusing to admit guilt to the underlying offense during his

psychosexual evaluations. Instead, he was not given a benefit that may be extended to defendants who accept responsibility for their wrongs. Probation has been regarded traditionally as a form of leniency. Moreover, "[t]he Fifth Amendment does not insulate a defendant from all 'difficult choices' that are presented during the course of criminal proceedings, or even from all choices that burden the exercise or encourage waiver of the Fifth Amendment's right against self-incrimination." Further, presenting a defendant with the choice between admitting responsibility with a greater chance of receiving a favorable psychosexual evaluation or denying responsibility with a greater risk of receiving an unfavorable evaluation is consistent with the historical practice and understanding that a sentence imposed upon a defendant may be shorter if rehabilitation looks more certain and that confession and contrition are the first steps along the road to rehabilitation. Rehabilitation is a key factor in extending leniency to convicted offenders.

Id. at 883 (footnotes omitted).

The grant of probation in Tennessee is, likewise, a benefit or privilege that may be conferred upon a defendant if he meets his burden of establishing that he is a suitable candidate for such largesse. State v. Tester, 879 S.W.2d 823, 828 (Tenn. 1994); State v. Correll, 626 S.W.2d 699, 701 (Tenn. 1982). At the time the crime was committed, Tennessee Code Annotated section 40-35-303(a) provided that a defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed was eight years or less. Tenn. Code Ann. § 40-35-303(a) (2003). The defendant is not automatically entitled to probation as a matter of law, see id. § 40-35-303(b), and the burden is on the defendant to show that the denial of probation was improper, see State v. Summers, 159 S.W.3d 586, 599-600 (Tenn. Crim. App. 2004) (citing Ashby, 823 S.W.2d at 169); see also State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997) (stating that "[a] criminal defendant seeking full probation bears the burden on appeal of showing the sentence actually imposed is improper, and that full probation will be in both the best interest of the defendant and the public").

There is no bright line rule for determining when a defendant should be granted probation. State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 10-11 (Tenn. 2000). Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, the defendant's potential for rehabilitation or treatment, and the best interest of the defendant and the public. Souder, 105 S.W.3d at 607; State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). A defendant's failure to accept responsibility for his or her criminal conduct reflects poorly on rehabilitative potential and is a basis for the denial of probation. See State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996).

The defendant in Souder, who pled nolo contendere to one count of attempted sexual battery, argued on appeal that the trial court erred by denying probation, in part, on the fact that he invoked

his Fifth Amendment privilege against self-incrimination when asked by the prosecutor at sentencing whether he had molested other children in the past. 105 S.W.3d at 604-05. We affirmed the denial of probation, concluding that Mitchell does not prohibit a trial court from considering a defendant's invocation of his Fifth Amendment privilege against self-incrimination as part of its overall calculus for determining suitability for probation:

> The United States Supreme Court has recently made clear that a criminal defendant retains his or her right to assert the Fifth Amendment privilege against self-incrimination during sentencing. See Mitchell v. United States, 526 U.S. 314, 119 S. Ct. 1307, 143 L. Ed. 2d 424 (1999). Moreover, the sentencing court may draw no adverse inference from the defendant's silence in determining facts about the crime which bear upon the severity of the sentence. Id., 526 U.S. at 316-17, 119 S. Ct. 1307. However, the Court specifically declined to opine as to whether the defendant's silence may bear upon his or her lack of remorse or acceptance of responsibility for the crime in setting the defendant's sentence. Id., 526 U.S. at 330, 119 S. Ct. 1307.
>
> In the case before us, the trial court did not draw any adverse inferences about the facts of the crime from the Defendant's refusal to answer the State's question. Rather, the trial court included the Defendant's silence in its overall calculus for determining whether the Defendant was a suitable candidate for probation. As set forth above, a criminal defendant's rehabilitative potential is a factor to be considered in the grant or denial of probation. Candor is a relevant factor in assessing a defendant's potential for rehabilitation, see State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994), and the lack of candor militates against the grant of probation. See, e.g., State v. Kendrick, 10 S.W.3d [650,] 656 [(Tenn. Crim. App. 1999)]. The burden of proving suitability for probation rests with the defendant. Tenn. Code Ann. § 40-35-303(b). Accordingly, we conclude that the trial court did not infringe upon the Defendant's rights under the Fifth Amendment to the United States Constitution, or Article I, Section 9 of the Tennessee Constitution, when it relied, in part, on the Defendant's assertion of those rights at sentencing, in order to deny probation. This issue is, therefore, without merit.

Id. at 608.

The defendant seeks to distinguish his case by pointing out that, unlike the defendants in Souder, Dzul, and Kennedy, he made no admissions of guilt, did not testify at his sentencing hearing, and never agreed to participate in the psychosexual examination. He contends that "he properly asserted his [Fifth] Amendment privilege against self-incrimination and made no statements, and therefore under Mitchell . . . his silence cannot be used against him." The distinction the defendant draws, however, has no bearing on the holding in Mitchell. As previously stated, Mitchell held simply that a trial court may not draw any adverse inferences from a defendant's silence in determining facts about the crime which bear upon the severity of the sentence. 526 U.S. at 330, 119

S. Ct. at 1316. Here, the trial court drew no adverse inferences about the crime from the defendant's silence. Instead, the court concluded that it had no choice but to deny probation because the defendant had not undergone the required psychosexual evaluation and presented no proof regarding alternative treatment options or his risk to reoffend:

> The more troubling aspect of this is the nature in which he should serve this sentence. Now, [the defendant] has challenged the law in the State of Tennessee that requires once a person is convicted of a sexual offense that they undergo a psychosexual evaluation to determine the appropriate manner of service of the sentence, whether it be probation, and if it is probation whether there should be some particular treatment modalities that are put in place to address whatever potential issues there are.

> Now, [the defendant] has resisted undergoing that psychosexual evaluation based on the fact that he claims that it's unconstitutional for him to go in and basically incriminate himself. Of course, that is not the law in the State of Tennessee. And I understand that you intend to challenge that. And I encourage you to do that. But without the advantage of knowing what, if any, appropriate treatment would be appropriate for [the defendant] I feel compelled to order that he serve this sentence, because I don't know what the alternatives are. I have no alternatives set before me whether some treatment that would be appropriate could be put in place. Whether he's a high risk to reoffend or a low risk to reoffend. All of these things that a professional is able to glean from their examination and interview with the defendant.

> So I think based on the fact that he has chosen -- which he has the right to do -- chosen not to undergo this psychosexual evaluation it leaves this Court in a position of not having any options but to order that this sentence be served in the State Department of Corrections.

We conclude that the record supports the denial of probation. Because the defendant elected not to undergo the psychosexual evaluation and presented no other proof at the sentencing hearing, he failed to meet his burden of demonstrating that he was a suitable candidate for probation. We, therefore, affirm the trial court's denial of the defendant's request for probation. On appeal, the defendant has asserted that if this court rules against him on his constitutional claims as to submitting to the sex offender evaluation, that we then remand the matter so that he may submit to the evaluation and be resentenced. As we have stated, the defendant sought an interlocutory appeal, prior to his sentencing, presenting this same question. This court denied the interlocutory appeal. If we remanded this matter so that the defendant could be resentenced, the effect would be the same as if the interlocutory appeal had been granted. Accordingly, we deny this request.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the defendant's conviction but reduce his sentence to one year.

_____
ALAN E. GLENN, JUDGE